**RILEY SAFER HOLMES & CANCILA LLP**
SONDRA A. HEMERYCK (*pro hac vice*)
shemeryck@rshc-law.com
ELI LITOFF (*pro hac vice*)
elitoff@rshc-law.com
STEVEN E. VOGEL (*pro hac vice*)
svogel@rshc-law.com
1 S. Dearborn Street, Suite 2200
Chicago, IL 60603
Telephone:    (312) 471-8700
Facsimile:    (312) 471-8701
JEFFREY R. WILLIAMS (CSB No. 084156)
jwilliams@rshc-law.com
456 Montgomery Street, 16th Floor
San Francisco, CA 94104
Telephone:    (415) 275-8550
Facsimile:    (415) 275-8551

*Attorneys for Defendant*
UNITED AIRLINES, INC.

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARC BRENMAN, AVIVA COPAKEN, SEAN MINYARD, ROBERT MONROE, and CINDY PAWLOWSKI, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED AIRLINES, INC.,<br><br>Defendant. | Case No. 3:25-cv-06995-JD<br><br>**DECLARATION OF NOEMI KELLEY**<br><br>DATE: January 22, 2026<br>TIME:  10:00 a.m.<br>COURTROOM: 11<br><br>Honorable James Donato<br>United States District Judge |

I, Noemi Kelley, declare as follows:

1.      I make this declaration in support of Defendant United Airlines, Inc.'s ("United") Motion to Dismiss the First Amended Complaint filed by Plaintiffs Marc Brenman, Aviva Copaken, Sean Minyard, Robert Monroe and Cindy Pawlowski (collectively, "Plaintiffs") in the above-captioned matter. I am over 18 years of age, have personal knowledge of the facts set forth

in this Declaration and, if called to testify as a witness, can testify fully and competently as to those facts.

2.     I am the Manager – Legal Department Operations & Administration in the Legal Department of United. As part of my duties as Manager in the Legal Department, I am responsible for maintaining copies of United's Contract of Carriage (the "CoC"). This Declaration is based on my personal knowledge and my review of United's records that are kept and maintained in the ordinary course of United's business.

3.     Attached hereto as Exhibit 1 is a true and correct copy of the current version of the CoC, which has been in effect since January 22, 2025. In accordance with United's standard practice, the attached CoC has been available on United's website, www.united.com, since that date.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on November 7, 2025.

Noemi Kelley
_____
Noemi Kelley

# EXHIBIT 1

**UNITED AIRLINES, INC.**
**CONTRACT OF CARRIAGE**

**(revised January 22, 2025)**

Transportation of Passengers and Baggage provided by United Airlines, Inc. and Carriers doing business as United Express, are subject to the following terms and conditions, in addition to any terms and conditions printed on or in any ticket, ticket jacket or eticket receipt. To the extent there is a conflict between this Contract of Carriage and any terms and conditions printed on or in any ticket, ticket jacket or eticket receipt, this Contract governs. By purchasing a ticket or accepting transportation, the passenger agrees to be bound by these controlling terms of this Contract of Carriage, and no covenants at law or in equity shall be implied or incorporated. Note, only the English version of United's Contract of Carriage governs the transportation of Passengers and Baggage provided by United Airlines, Inc. and Carriers doing business as United Express.

**Table of Contents**

| | | PAGE |
|---|---|---|
| RULE 1 | DEFINITIONS | 2 |
| RULE 2 | STANDARD FORMAT OF ELECTRONIC RULES FOR TARIFF FILING PURPOSES | 8 |
| RULE 3 | APPLICATION OF CONTRACT | 9 |
| RULE 4 | RESERVATIONS — CONFIRMATION/FARE QUOTES/DISCLOSURES | 10 |
| RULE 5 | CANCELLATION OF RESERVATIONS | 10 |
| RULE 6 | TICKETS | 12 |
| RULE 7 | TICKET VALIDITY PERIOD | 13 |
| RULE 8 | RETURNED CHECK CHARGE | 14 |
| RULE 9 | DELETED | 14 |
| RULE 10 | TRANSATLANTIC SURCHARGES | 14 |
| RULE 11 | PACIFIC SURCHARGES | 14 |
| RULE 12 | WESTERN HEMISPHERE SURCHARGES | 14 |
| RULE 13 | ACCEPTANCE OF CHILDREN/MINORS AND INFANTS | 14 |
| RULE 14 | SPECIAL SERVICES | 15 |
| RULE 15 | MEDICAL SERVICES | 16 |
| RULE 16 | SERVICE ANIMALS | 17 |
| RULE 17 | GROUND TRANSFER SERVICE | 18 |
| RULE 18 | SERVICE PROVIDED BY UNITED EXPRESS AND OTHER CODESHARE PARTNERS | 19 |
| RULE 19 | TRAVEL DOCUMENTS | 19 |
| RULE 20 | SCREENING OF PASSENGERS AND BAGGAGE | 19 |
| RULE 21 | REFUSAL TO TRANSPORT | 19 |
| RULE 22 | SMOKING POLICY | 21 |
| RULE 23 | BAGGAGE | 21 |
| RULE 24 | FLIGHT DELAYS/CANCELLATIONS/AIRCRAFT CHANGES | 33 |
| RULE 25 | DENIED BOARDING COMPENSATION | 36 |
| RULE 26 | REROUTING | 38 |
| RULE 27 | REFUNDS | 38 |
| RULE 28 | ADDITIONAL LIABILITY LIMITATIONS | 41 |
| RULE 29 | CUSTOMER SERVICE COMPLAINTS | 46 |
| RULE 30 | CONSENT TO USE OF PERSONAL DATA | 46 |

**RULE 1    DEFINITIONS**

As used in this Contract of Carriage, the following terms, whether or not capitalized, shall have the meanings ascribed below:

Add-On-Fare:  See "Arbitrary"

Adult means a person who has reached his/her eighteenth birthday as of the date of commencement of travel.

Africa means the area composed of all the countries on the continent of Africa, other than Algeria, Morocco, Sudan, Tunisia, and Egypt, but including the following Islands:  Cape Verde, Comoros, Madagascar, Mauritius, Reunion, Sao Tome y Principe, and Seychelles.

Alternate Transportation means air transportation with a confirmed reservation at no additional charge (by any scheduled airline licensed by DOT), or other transportation accepted and used by the passenger in the case of denied boarding.

Animals means domesticated cats and dogs.

Applicable Adult Fare means the fare which would be applicable to an adult for the transportation excepting those special fares applicable to a passenger's status, e.g., military fares, adult standby, etc.

Airline Designator Code is the two letter identification code that reflects the Marketing Carrier, which may be different from the carrier operating the flight.

Arbitrary means an amount published for use only in combination with other fares for the construction of Through Fares.  It is also referred to as "Proportional Fare", "Basing Fare", and "Add-On-Fare".

Area No. 1 (or "Area 1") means the area composed of all of the North and South American continents and the islands adjacent thereto, Greenland, Bermuda, the West Indies, the islands of the Caribbean Sea, and the Hawaiian Islands (including Midway and Palmyra).

Area No. 2 (or "Area 2") means the area composed of all of Europe (including that part of the Russian Federation in Europe) and the islands adjacent thereto, Iceland, the Azores, all of Africa and the islands adjacent thereto, Ascencion Island and that part of Asia lying west of and including Iran.

Area No. 3 (or "Area 3") means the area composed of all of Asia and the islands adjacent thereto except that portion included in Area No. 2, all of the East Indies, Australasia, the islands of the Pacific Ocean except those included in Area No. 1, and the Russian Federation (East of the Ural Mountains).

Asia means the area composed of Afghanistan, Bangladesh, Bhutan, Brunei, China, Hong Kong, India, Indonesia, the Islands of the Pacific in Area No. 3 north of the equator, Japan, Kazakhstan, Kampuchea, Korea, Kyrgyzstan, Laos, Malaysia, Maldive Islands, Myanmar, Nepal, Outer Mongolia, Pakistan, Philippines, Russian Federation (East of the Ural Mountains), Singapore, Sri Lanka, Taiwan, Tajikistan, Timor, Thailand, Turkmenistan, Uzbekistan and Viet Nam.

Australasia means the area composed of Australia, New Caledonia, New Zealand, New Hebrides, Fiji, Samoa, Cook Islands, Papua, New Guinea, Tahiti and the islands adjacent thereto.

Baggage means such reasonable articles, effects and other personal property of a ticketed Passenger as are reasonably necessary or appropriate for the wear, use, comfort or convenience of the Passenger in connection with the Passenger's trip. Unless otherwise specified, it shall include both checked and unchecked baggage and property of the Passenger.

Baggage Check or Baggage Claim Tag mean those portions of the ticket that identify the carriage of a Passenger's checked baggage and that are issued by the carrier as a receipt for the Passenger's checked baggage.

Baggage Rules mean the conditions associated with the acceptance of baggage, including all applicable service charges, and services incidental to the transportation of baggage. See Rule 23 for more information.

Baggage Tag means a document issued by the carrier solely for identification of checked baggage, the portion of which is attached by the carrier to a particular article of checked baggage.

Banker's Buying Rate ("BBR") means the rate at which, for the purpose of the transfer of funds through banking channels (i.e., other than transactions in bank notes, travelers cheques and similar banking instruments), a bank will purchase a given amount of foreign currency in exchange for one unit (or units) of the national currency of the country in which the exchange transaction takes place.

Banker's Selling Rate ("BSR") means the rate at which, for the purpose of the transfer of funds through banking channels (i.e., other than transactions in bank notes, travelers cheques and similar banking instruments), a bank will sell a given amount of foreign currency in exchange for one unit (or units) of the national currency of the country in which the exchange transaction takes place.

Basing Fare:  See "Arbitrary"

Cabin Baggage means Carry-On-Baggage that due to its size and nature requires the purchase of a seat on board the aircraft to transport the piece of baggage.

Calendar Month means the period of time starting with the start of any day in a month, identified by number, and ending with the start of the same day of the following month.  When the same day does not occur in the following month, this period ends on the last day of the month.

Calendar Week means a period of seven days starting at 12:01 a.m. Sunday and ending at midnight of the following Saturday, provided that when used in reference to service offered only once a week between points of travel, it shall mean a period of eight days commencing with 12:01 a.m. on the day the flight operates.

Caribbean Area means the area composed of Anguilla, Antigua, Aruba, Bahamas, Barbados, Barbuda, Bermuda, Bonaire, British Virgin Islands, Cayman Islands, Cuba, Curacao, Dominica, Dominican Republic, Grenada, Guadeloupe, Haiti, Jamaica, Leeward Islands, Martinique, Montserrat, Netherlands Antilles, Nevis, Saba, St. Barthelemy, St. Eustatius, St. Kitts, St. Lucia, St. Maarten, St. Vincent, Trinidad and Tobago, Turks and Caicos Islands, West Indies and Windward Islands.

Carriage means transportation of Passengers and their baggage by air or ground, either gratuitously or for payment.

Carrier means the carrier (air or ground) issuing the ticket and all carriers that carry or undertake to carry the Passenger and/or his baggage thereunder.

Carry-on-Baggage means baggage, other than Checked Baggage, carried on board an aircraft by a ticketed Passenger also known as unchecked baggage.

Central Africa means the area composed of Malawi, Zambia and Zimbabwe.

Central America means the area composed of Belize, Costa Rica, El Salvador, Guatemala, Honduras, Nicaragua and Panama.

Checked Baggage means baggage that a ticketed Passenger has requested be carried by the carrier and for which the carrier has issued a Baggage Claim Tag to the Passenger.

Child means a person who has reached his/her second birthday but not his/her 12th birthday as of the date of commencement of travel.

Circle Trip means travel from a point and return thereto by a continuous, circuitous air route (including journeys comprising two (2) fare components but which do not meet the conditions of the round trip definition), provided, that where no reasonable direct scheduled air route is available between two points, a break in the circle may be traveled by any other means of transportation without prejudice to the circle trip.

Civic Aeronautics Board ("C.A.B.") means the United States Department of Transportation ("DOT").

Codeshare means an arrangement by which UA offers transportation service to a Passenger who is ticketed with the two letter airline designator code "UA" on a flight that is operated by a carrier other than UA.

Comparable air transportation means transportation provided by air carriers or foreign air carriers holding certificates of public convenience and necessity or foreign permits.

Confirmed reserved space means space on a specific date and on a specific flight and class of service that has been requested by a passenger, and that UA or its agent has verified by appropriate notation on the ticket as being reserved for the accommodation of the passenger.

Conjunction Ticket means two or more tickets concurrently issued to a Passenger and which together constitute a single contract of carriage.

Connection means a stop at an intermediate point on the route to be traveled where a change of planes is made and which does not fall within the definition of a stopover.

Consequential Damages means damages which are the result of an act but are not direct or immediate.

Contiguous United States or Continental United States mean the District of Columbia and all states of the United States other than Alaska or Hawaii.

Contract of Carriage means the terms and conditions contained in this document, as amended from time to time by the Carrier.

Country of Commencement of Transportation means the country from which travel on the first international sector takes place.

Country of Payment means the country where payment is made by the purchaser to the carrier or its agent.  Payment by check, credit card or other banking instruments shall be deemed to have been made at the place where such instrument is accepted by the carrier or its agent.

Days means full calendar days, including Sunday and legal holidays, provided that for the purposes of notification, the balance of the day upon which notice is dispatched shall not be counted; and that for purposes of determining the duration of a validity period, the balance of the day upon which the ticket is issued or the flight commenced shall not be counted.

Department of Transportation ("DOT") means the United States Department of Transportation.

Destination means the ultimate point of the Passenger's journey as shown on the Ticket.

Domestic Carriage ("Domestic") means (except as otherwise specified) carriage in which, according to the Contract of Carriage, the place of departure, the place of destination or stopover, and the entire transportation is between points within the United States, or points within another sovereign state.

DOT Hazardous Materials Regulations are those regulations issued by the Materials Transportation Bureau of the Department of Transportation in Title 49 of the Code of Federal Regulations, Parts 171 through 180 (49 CFR 171-180).

Down Line Carrier means any carrier, other than the selecting carrier, who is identified as providing interline transportation to the passenger by virtue of the passenger's ticket.

East Africa means the area composed of Burundi, Djibouti, Ethiopia, Kenya, Rwanda, Somalia, Tanzania and Uganda.

Europe means the area composed of Albania, Algeria, Andorra, Armenia, Austria, Azerbaijan, Azores, Belarus, Belgium, Bosnia and Herzegovina, Bulgaria, Canary Islands, Croatia, Czech Republic, Denmark, Estonia, Finland, France, Georgia, Germany, Gibraltar, Greece, Hungary, Iceland, Ireland, Italy, Latvia, Lichtenstein, Lithuania, Luxembourg, Madeira, Malta, Monaco, Morocco, Netherlands, Norway, Poland, Portugal, Romania, Russian Federation (West of the Ural Mountains), San Marino, Slovakia, Slovenia, Spain, Sweden, Switzerland, Tunisia, Turkey in Europe and Asia, Ukraine, and the United Kingdom.

Fare Component means each local currency fare (except Add-On-Fares) where more than one such fare is used in construction of the total fare for a journey.

Flight Coupon means a portion of the Ticket that indicates travel points between which the coupon is good for carriage.

Force Majeure Event – any of the following situations: (a) Any condition beyond UA's control including, but not limited to, meteorological or geological conditions, acts of God, riots, terrorist activities, civil commotions, embargoes, wars, hostilities, disturbances, or unsettled international conditions, either actual, anticipated, threatened or reported, or any delay, demand, circumstances, or requirement due directly or indirectly to such condition; (b) Any strike, work stoppage, slowdown, lockout, or any other labor-related dispute involving or affecting UA's services; (c) Any governmental regulation, demand or requirement; (d) Any shortage of labor, fuel, or facilities of UA or others; (e) Damage to UA's Aircraft or equipment caused by another party; (f) Any emergency situation requiring immediate care or protection for a person or property; or (g) Any event not reasonably foreseen, anticipated or predicted by UA.

Foreign Air Transportation means transportation between a point in the United States and a point outside thereof.

Half Round Trip Fare means 50 percent of a specified or constructed round trip normal or special fare.  In the absence of a specified or constructed round trip normal fare, the one way normal fare is considered to be a half round trip normal fare.  If a specified or constructed one way special fare may be doubled to establish a round trip special fare, the one way special fare is considered to be a half round trip special fare.

Hawaii means Hilo, Honolulu, Kona, Lihue, and Maui.

IATA Rate of Exchange means the published rate of exchange issued by IATA from time to time.

Iberian Peninsula means the area composed of Gibraltar, Portugal (including Azores and Madeira) and Spain (including Balearic and Canary Islands).

Immediate Family Member means spouse, children, step-children, foster children, legally adopted wards, son/daughter-in-law, grandchildren, parents, step-parents, legal guardians, mother/father-in-law, grandparents, brother/sister, step-brother/sister, half-brother/sister, brother/sister-in-law, aunts/uncles and nieces/nephews.

Indian Ocean Islands means Comoros, Madagascar, Mauritius, Mayotte, Reunion and Seychelles.

Indian Subcontinent means the area composed of Afghanistan, Bangladesh, Bhutan, India, Nepal, Pakistan, Republic of Maldives and Sri Lanka.

Infant means a person who has not reached his/her second birthday as of the date of commencement of travel.

Interchange flight means a flight operated over the routes of two or more carriers without change of equipment.

Interline Transfer Point means any point at which the Passenger transfers from the services of one carrier to the services of another carrier.

Interline Transportation/Interline Agreement means carriage on the services of more than one carrier where carriers agree to accept each other's tickets and baggage.

Interline Itinerary means flights reflected on a single ticket involving more than one carrier.

International Carriage ("International") means any carriage other than Domestic Carriage, however, when the Warsaw and/or Montreal Conventions are applicable, the stated definitions of "International" therein shall prevail.

International Sector means a Sector of uninterrupted air travel for which the arrival and departure points are in two different countries.

NOTE:  For purposes of applying fares under this Contract of Carriage:
1)  Travel on a sector between the U.S.A. and Canada is not considered international, and
2)  For fare construction purposes, when transoceanic travel is involved in a fare component, travel on the transoceanic sector shall be considered the international sector.

Interstate Transportation means transportation between a point in any state of the United States and the District of Columbia and a point in any other state of the United States or the District of Columbia.

Intraline Transportation or "On-line" transportation means carriage solely over the services of a single air carrier.

Journey means all travel included on a Ticket or group of Conjunction Tickets.

Legal Guardian means one who legally has the care and management of an infant/minor.

Local Currency Fares means fares and related charges expressed in the currency of the Country of Commencement of Transportation.

Major Life Activities means functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.

Marketing Carrier means the carrier that sells flights under its Airline Designator Code, which code is identified on the first flight segment of the Passenger's ticket (i.e., Selected/Selecting Carrier for purposes of Interline Transportation to Canada only).

Maximum Outside Linear Dimensions means the sum of the greatest outside length plus the greatest outside width, plus the greatest outside height.

Medical Certificate means a letter or form from the Passenger's treating physician or hospital, where applicable, which must be signed and dated within one week of the first affected flight departure by the treating physician, or hospital in the country where the illness or treatment arose and which certifies the nature of the Passenger's illness and treatment.

Micronesia means the area composed of Guam, Johnston Island, Marshall Islands, Caroline Islands, Palau Island and Mariana Islands.

Mid-Atlantic Area means the area composed of Anguilla, Antigua, Bahamas, Barbuda, Barbados, Bermuda, Bolivia, Bonaire, Belize, Cayman Islands, Colombia, Costa Rica, Cuca, Curacao, Dominican Republic, Ecuador, El Salvador, French Guiana, Guadeloupe, Guyana, Haiti, Honduras, Jamaica, Martinique, Montserrat, Navis, Nicaragua, Panama, Peru, Puerto Rico, St. Kitts, St. Croix, St. Maarten, St. Thomas, Surinam, Trinidad, Tobago, and Venezuela.

Middle East means the area composed of Aden, Bahrain, Cyprus, Egypt, Iran, Iraq, Israel, Jordan, Kuwait, Lebanon, Muscat and Oman, Qatar, Saudi Arabia, Sudan, Syria, Trucial, United Arab Emirates and Yemen.

Military Agencies mean departments of the U.S.A. Army, Navy, and Air Force, the Marine Corps, the Coast Guard, the respective academies of the Army, Navy, Air Force, and Coast Guard, and the National Guard.  The Reserve Officer Training Corps is not included.

Military Passenger means military personnel of the Military Agencies who are on active duty status or who have been discharged from active military service within seven days of the date of travel.

Minor means a person who has reached his/her second birthday but not his/her 18th birthday as of the date of commencement of travel.

Montreal Convention means the Convention for the Unification of Certain Rules for International Carriage by Air, signed at Montreal, May 28, 1999.

Netherlands Antilles means the islands of Bonaire, Curacao and St. Maarten.

Normal Fare means the full fare established for regular or usual service, the application of which is not dependent upon any limited period of ticket validity or other special circumstances.  Unless otherwise herein specified, Normal Fares shall be considered to include the following, all year one-way, round trip, circle trip and open jaw trips, First Class, Business Class,

Executive Class, Economy Class, Basic Economy, one-class Standard Service, Standard Services, Tourist/Coach Class service, Thrift Class service fares, and on-season and off-season fares.

North America means the area composed of Alaska, Canada, the Continental U.S.A. and Mexico.

North Central Pacific means all routes between points in Canada/U.S.A. and points in Area No. 3, except points in the Southwest Pacific, via the Pacific Ocean.

On-line means air transportation wholly on the same carrier.

On-line Tariff Data Base means the remotely accessible, on-line version, maintained by the filer, of (1) the electronically filed tariff data submitted to the "official DOT tariff database," and (2) the DOT approvals, disapprovals and other actions required by DOT.

On-line Transfer Point means any point at which the Passenger transfers from one service of a carrier to another service of the same carrier (bearing a different flight number).

Open-Jaw Trip means travel which is essentially of a round trip nature but the outward point of departure and inward point of arrival and/or outward point of arrival and inward point of departure are not the same.

Operating Carrier means the carrier that operates the actual flight.

Origin means the initial starting place of the journey.

Other Charges means charges such as taxes, fees, etc., not to be shown in the fare construction box of the ticket, excluding excess baggage charges.

Outward point means the stopover point on the passenger's itinerary that is the furthest from the passenger's point of origin.

Oversold Flight means a flight where there are more Passengers holding valid confirmed Tickets that check-in for the flight within the prescribed check-in time than there are available seats.

Participating Carrier includes both the selecting carrier and the down line carrier who has been identified as providing interline transportation to the passenger by virtue of the passenger's ticket.

Passenger means any person, except members of the crew, carried or holding a confirmed reservation to be carried in an aircraft with the consent of the carrier.

Passenger Coupon means that portion of the Ticket constituting the Passenger's written evidence of the Contract of Carriage.

Proportional Fare:  See "Arbitrary" above.

Qualified Individual with a Disability means any individual who has a physical or mental impairment that, on a permanent or temporary basis, substantially limits one or more Major Life Activities, has a record of such an impairment, or is regarded as having such an impairment.  The phrases used in this definition are further defined in 14 CFR Part 382.3.

Related Charges means those charges to be shown in the fare construction box of the ticket and excess baggage charges.

Reroute means a change of routing, carriers, fares, class of service, flight or date from that originally provided on the ticket, but does not apply to open tickets.

Resident ("a Resident") means a person whose usual residence is in a certain country, provided that a more restricted definition may apply under local law.

Round-Trip means travel from one point to another and return by any air route for which the same normal all year through one way fare of the same class applies from the point of origin, provided that this definition shall not apply to travel for which the same all year through one way fare is established, between two points, in either direction around the world.

Routing means the cities and/or class of service and/or type of aircraft via which carriage is provided by the carrier(s) between two points.

Scandinavia means the area composed of Denmark, Norway and Sweden.

Search and Rescue Animal means a trained animal that assists law enforcement officers in the search of contraband and or other items, or which provides assistance with rescue efforts.

Sector or Segment is the portion of a journey covered by a single Flight Coupon.

Selected Carrier means the carrier whose baggage rules apply to the entire interline itinerary.

Selecting Carrier means the carrier whose designator code is identified on the first flight segment of the passenger's ticket at the beginning of an interline itinerary.

6

Service Animal means a dog, regardless of breed or type, that is individually trained to do work or perform tasks for the benefit of a Qualified Individual with a Disability, including a physical, sensory, psychiatric, intellectual, or other mental disability, or a Search and Rescue Animal.

Service Animal Relief Attestation Form means a form made available by United that is consistent with the requirements of 14 CFR §382.75(b) concerning the U.S. Department of Transportation Service Animal Air Relief Attestation Form.

Service Animal Transportation Form means a form made available by United that is consistent with the requirements of 14 CFR §382.75(a) concerning the U.S. Department of Transportation Service Animal Air Transportation Form.

Single Ticket means the record of agreement that permits travel from origin to destination, and may include interline, code-share, and intraline segments.

South America means the area composed of Argentina, Bolivia, Brazil, Chile, Colombia, Ecuador, French Guiana, Guyana, Paraguay, Peru, Surinam, Uruguay and Venezuela.

South Asian Subcontinent means the area composed  of Afghanistan, Bangladesh, Bhutan, India, Nepal, Pakistan, Maldives and Sri Lanka.

South East Asia means the area composed of Brunei Darussalam, China, Guam, Hong Kong, Indonesia, Kampuchea, Kazakhstan, Kyrgyzstan, Laos, People's Democratic Republic of, Malaysia, Mongolia, Myanmar, Philippines, Singapore, Taiwan, Province of, Tajikistan, Thailand, Turkmenistan, Russian Federation (East of the Ural Mountains), Uzbekistan and Viet Nam.

South Pacific means the area composed of all routes between points in the U.S.A./Canada and points in the Southwest Pacific via the Pacific Ocean.

Southwest Africa means points within Africa composed of Botswana, Lesotho, Mozambique, Namibia, South Africa and Swaziland.

Southwest Pacific means that area composed of American Samoa, Australia, Cook Islands, Fiji, French Polynesia, Gilbert and Ellice Islands, Loyalty Islands, New Caledonia, New Hebrides, New Zealand, Papua, New Guinea, Samoa, Society Islands, Tonga, and intermediate islands.

Special Drawing Right ("SDR") means a special unit of currency, the value of which fluctuates and is recalculated each banking day.  These values are known to most commercial banks and are reported in some newspapers and in the IMF Survey, published weekly by the International Monetary Fund, Washington, D.C.  20431.

Special Fare means a fare other than a normal fare.

Stopover means a deliberate interruption of travel by the Passenger, agreed to in advance by the carrier, at a point between the place of departure and the place of destination.  For International flights a Stopover will also be deemed to occur at an intermediate point from which the Passenger is not scheduled to depart on the date of arrival, but if there is no connecting departure scheduled on the date of arrival, departure on the next day within 24 hours of arrival shall not constitute a Stopover. If a portion of the routing is traveled by surface transportation, one Stopover shall be deemed to have been taken for such portion.  For Domestic flights, a Stopover will also occur when a Passenger arrives at a point and fails to depart from such point on:
1) The first flight on which space is available; or
2) The flight that will provide for the Passenger's earliest arrival at intermediate or junction transfer point(s) or destination point, via the carrier and class of service as shown on the Passenger's Ticket; provided, however, that in no event will a Stopover occur when the Passenger departs from the intermediate/junction point on a flight shown in the carrier's official general schedule as departing within four hours after arrival at such point.

Summary Page at the End of an Online Purchase (for Rule 23 I) only) means a page on the Carrier's website which summarizes the details of a ticket purchase transaction just after the passenger has agreed to purchase the ticket from the Carrier and has provided a form of payment.

Surface Sector means transportation by means other than air between two intermediate points in a Fare Component.

Through Fare means a fare applicable for travel between two consecutive fare construction points via an intermediate point(s).

Ticket means the record of agreement, including electronic tickets, e.g., "United Electronic Tickets" or "eTickets," for Passenger air transportation provided by UA under certain terms and conditions to the Passenger named on the Ticket and in accordance with applicable governing tariffs and regulations. An "eTicket" is the record of the ticket agreement maintained and processed within the carrier's electronic reservation system. A receipt is provided to the purchaser of the ticket that contains a reference for retrieving the record within the carrier's reservation system and summary of the ticket information. The carrier may mandate the issuance of an e-ticket, regardless of market, carrier, form of payment, and customer type.

Ticketed Point means points shown in the 'good for passage' section of the ticket plus any other point(s) used for fare construction and shown in the fare construction box of the ticket, provided that two flight numbers of two carriers such as for an interchange flight will not be permitted on one Flight Coupon.

Transatlantic Sector means that portion of travel covered by a single Flight Coupon from the point of departure in Area No. 1 to the point of arrival in Area No. 2 and vice versa.

Transfer means a change from the flight on one carrier to the flight of another carrier, or a change from the flight of a carrier to another flight of the same carrier bearing the same flight number, or a change from the flight of a carrier to another flight that is a service bearing a different flight number of the same carrier, irrespective of whether or not a change of aircraft occurs.

Transfer Point means any point at which the Passenger Transfers.

Transit Point means any stop at an intermediate point on the route to be traveled (whether or not a change of aircraft is made) which does not fall within the definition of a Stopover.

Transoceanic means the portion of travel covering the area over an ocean and may refer to travel that is either transatlantic or transpacific.

Transpacific Sector means the portion of travel covered by a single Flight Coupon from the point of departure in Area No. 1 to the point of arrival in Area No. 3 and vice versa.

UA means United Airlines, Inc.

UA Ticket Stock means tickets printed, imprinted or issued electronically with the UA carrier code (016) as part of the ticket serial number.

Ultimate ticketed destination applies only to situations where a passenger's origin is a non-Canadian point and the itinerary includes at least one stop in Canada, as well as at least one stop outside of Canada. If the stop in Canada is the farthest checked point and the stop is more than 24 hours, the ultimate ticketed destination is Canada. (For Rule 23 I) only).

United means United Airlines, Inc.

United Express carriers are Carriers not wholly owned or operated by United Airlines, Inc. but operating with the UA designator code under the trade name "United Express."

Unaccompanied Minor means a Child/Minor 5 to 14 years of age when traveling alone or not accompanied on the same flight and in the same compartment by a companion Passenger at least 18 years of age or with a Legal Guardian or parent.

United Kingdom (or "U.K.") means the area composed of England, Scotland, Wales, Northern Ireland, Channel Islands and Isle of Man.

United States of America (or the "United States" or the "U.S.A.") means, unless otherwise specified, the area composed  of the 48 contiguous states, the District of Columbia, Alaska, Hawaii, Puerto Rico, the U.S. Virgin Islands, American Samoa, the Commonwealth of the Northern Mariana Islands, Guam, Midway, and Wake Islands.

United States Department of Defense means the U.S.A. Department of the Army, Navy, and Air Force, and the U.S.A. Marine Corps.

Validate means a confirmation that the Ticket has been officially issued by the carrier.

Warsaw Convention means the Convention for the Unification of Certain Rules relating to International Carriage by Air, signed at Warsaw, October 12, 1929, or where applicable, that Convention, as amended, including without limitation, by the Protocol signed at The Hague September 28, 1955.

West Africa means the area composed of Angola, Benin, Burkina Faso, Cameroon, Cape Verde, Central African Republic, Chad, Congo (Brazzaville), Cote D'Ivoire, Equatorial Guinea, Gabon, The Gambia, Ghana, Guinea, Guinea-Bissau, Liberia, Mali, Mauritania, Niger, Nigeria, Sao Tome y Principe, Senegal, Sierra Leone, Togo and Congo (Kinshasa).

Western Hemisphere means the area composed of the Continental United States, Alaska, Hawaii, Puerto Rico, U.S. Virgin Islands, Canada, Greenland, Mexico, Central and South America, and the Caribbean Area.

**RULE 2    STANDARD FORMAT OF ELECTRONIC RULES FOR TARIFF FILING PURPOSES**

Rule number reserved for Airline Tariff Publishing Company ("ATPCO") filings.

**RULE 3    APPLICATION OF CONTRACT**

A)    These rules constitute the conditions of carriage upon which UA agrees to provide Domestic and International Carriage and are expressly agreed to by the Passenger. These Rules are also the tariffs filed by UA in accordance with certain government regulations.

B)    This Contract of Carriage is subject to applicable laws, regulations, rules, and security directives imposed by governmental agencies, including but not limited to those imposed during or as a result of a national emergency, war, civil unrest or terrorist activities. In the event of a conflict between the Rules contained herein and such government laws, regulations, rules, security directives and their corresponding effects on UA's operation, the latter shall prevail.

C)    The rules herein are applicable to transportation of Passengers and Baggage provided by UA. See Rule 18 regarding application of these rules to Codeshare services provided by UA on flights operated by a carrier other than UA.

D)    Certain International Carriage is subject to the rules relating to liability established by, and to all other provisions of the Warsaw and/or Montreal Conventions. Any provisions of these rules that are inconsistent with any provision of the applicable Convention shall, to that extent, but only to that extent, be inapplicable to International Carriage.

E)    Except as otherwise provided within specific fare rules, transportation is subject to the Contract of Carriage and charges in effect on the date on which the Ticket is issued. References to pages, rules, items and notes are coterminous and include revisions, supplements and reissues thereof.

F)    Where the Ticket has been purchased and issued before the effective date of an increase in the applicable fare, the increase will not be collected, provided there is no change in Origin, Destination, Stopover point(s), flight(s) or dates shown on the original Ticket. These provisions apply whether an increase results from a change in fare level, a change in conditions governing the fare or a cancellation of the fare itself.

G)    UA is responsible only for transportation of Passengers and Baggage provided by UA, which includes Codeshare services provided by UA on flights operated by a carrier other than UA. See Rule 18 regarding application of these rules to Codeshare services. When UA undertakes to issue a Ticket, check baggage, or make any other arrangements for transportation over the lines of any other carrier on an interline basis (whether or not such transportation is part of a through service), UA will act only as agent for the other carrier in these limited capacities, and will assume no responsibility for the acts or omissions of such other carrier, including but not limited to providing flight status information, delays and other acts or omissions that arise from their flight operations.

H)    No employee or agent of UA has the authority to alter, modify, or waive any fare rules or any provision of the Contract of Carriage unless authorized by a corporate officer of UA. UA's appointed agents and representatives are only authorized to sell Tickets for air transportation pursuant to approved fares, rules, and regulations of UA. Failure or delay on the part of either party to exercise any right or power herein shall not operate as a waiver thereof.

I)    Unless specifically stated otherwise herein or where any limitation would expressly violate any applicable law, UA shall not be liable for any consequential, compensatory, indirect, incidental or punitive damages arising out of or in connection with the performance of its obligations under these rules.

J)    UA's obligations hereunder extend only to the Ticketed Passenger. There are no third party beneficiaries to these rules.

K)    Except where provided otherwise by law, UA's conditions of carriage, rules and tariffs are subject to change without notice, provided that no such change shall apply to Tickets issued prior to the effective date of such change.

L)    The invalidity of any provision herein by local law shall not affect the validity of any other provision that shall remain in full force and effect.

M)    If UA makes arrangements for Passengers with any third party to provide any services other than carriage by air, or if UA issues a ticket or voucher relating to transportation or services (other than carriage by air) provided by a third party such as hotel reservations or car rental, UA does not assume responsibility for the ground transportation of any Passenger or his or her baggage. The terms and conditions of the third party service provider will apply, as well as Rule 17 B) below.

N)    Except as otherwise provided below, fare rule provisions, local or joint fares, including Arbitraries, contained in the On-line Tariff Database maintained by Airline Tariff Publishing Company on behalf of UA is considered to be part of International Passenger Rules and Fares Tariff No. IPR-2, C.A.B. No. 376, NTA(A) No. 210.I EXCEPTION: For Fares Published by Rule, see C.A.B. No. 737, NTA(A) No. 476.

O)    By purchasing a ticket or accepting transportation under this Contract of Carriage, the Passenger agrees to be bound by the Federal Aviation Act (49 U.S.C. 40101, et seq.), including the Airline Deregulation Act (49 U.S.C. 41713).

P)    By purchasing a ticket or accepting transportation under this Contract of Carriage, Passenger agrees that any lawsuit brought by Passenger against UA and Carriers doing business as United Express will be brought only in Passenger's individual capacity, and may not be brought in or asserted as part of a class action proceeding.

9

Q) You agree that you will notify United of any dispute arising out of or related to transportation covered by this Contract by submitting your concerns via the form at https://www.united.com/en/us/customercare, including a description of the nature of the dispute. Following delivery of such submission, you agree to allow United a period of sixty (60) days to provide a substantive response and to try to resolve the dispute prior to filing any lawsuit, arbitration, administrative or any other proceeding against United related to the dispute. Compliance with the notification procedures set forth herein shall be a condition precedent to your right to file any lawsuit, arbitration, administrative or any other proceeding against United. You agree that your failure to comply with the notification procedures set forth herein prior to filing a lawsuit, arbitration, administrative or any other proceeding against United shall entitle United to recover reasonable attorneys' fees incurred in defending the lawsuit, arbitration, administrative or other proceeding.

## RULE 4    RESERVATIONS — CONFIRMATION/FARE QUOTES/DISCLOSURES

A) A reservation for space on a given flight of UA is valid when the availability and allocation of such space is confirmed by UA or an authorized agent of UA and entered into the carrier's reservations system. At the time of reservation, UA requires the full name consisting of full first and last name for each passenger to be entered into the name field of the reservation, and other government mandated information, including but not limited to date of birth and gender. EXCEPTION: Only one name will be required for reservations for passengers whose passports reflect only one name. Reservations that do not contain the full name of each passenger, other required information, or fraudulent information will be automatically cancelled within 72 hours of reservation confirmation.  UA requires ticketing at the time of reservation.  UA will allow a 100% refund to the original form of payment if the request is made within 24 hours of ticketing and if the reservation is made one week or more prior to the scheduled flight departure and the ticket is purchased directly through UA.

B) Subject to payment or other satisfactory credit arrangements, a validated Ticket will be issued by UA or the authorized agent of UA indicating such confirmed reserved space provided the Passenger applies to UA or the authorized agent of UA for such Ticket within the Check-In Time Limits specified in Rules 5 D) and E). Such reservation of space is subject to cancellation by UA without notice if the Passenger does not comply with this Rule. EXCEPTION: Where other rules, including fare rules, provide for the issuance, validation, or purchase of a Ticket within specific time limits, these specific time limits will apply.

C) Once a Passenger obtains a Ticket indicating confirmed reserved space for a specific flight and date either from UA or its authorized agent, the reservation is confirmed even if there is no record thereof in UA's reservation system.

EXCEPTION: Tickets shall not be valid if reservations are cancelled pursuant to Rule 5 or cancelled by the passenger or his/her representative.

D) Seat assignments, regardless of class of service, are not guaranteed and are subject to change without notice.  UA reserves the right to reseat a Passenger for any reason, including but not limited to from a United First or Business class seat, United Polaris® seat, United® Premium Plus seat, Economy Plus seat, or from Preferred Seating for which the applicable fee, miles, or other compensation has been paid, and if a Passenger is improperly or erroneously upgraded to a different class of service.  If a Passenger is removed from a United First or Business class seat, United Polaris® seat, United® Premium Plus seat, Economy Plus seat, or from Preferred Seating for which a fee, miles, or other compensation has been paid, and the Passenger is not re-accommodated in a seat of equal or greater value, or if a Passenger is downgraded from a class of service and is not re-accommodated in a seat in an equal or greater class of service for which a fee, miles, or other compensation has been paid, the Passenger may be eligible for a refund in accordance with Rule 27. UA also prohibits Passengers from selling their seat assignments at any time and/or exchanging them at the time of boarding without first advising a member of the crew.

E) UA may limit the number of Passengers carried at any fare level and certain fares will not necessarily be available on all flights.  The number of seats which UA shall make available on a given flight will be determined by UA. Further, UA cannot guarantee any fare levels, fares, or seats/inventory associated with flights on Codeshare partners or on other airlines.

F) UA does not intend to file tickets priced at a zero or close to zero fare. If an erroneous fare or a fare that is reasonably apparent as erroneous is inadvertently published for sale and a ticket is issued at the erroneous fare before it has been corrected, UA reserves the right to cancel the ticket purchase and refund all amounts paid by the purchaser or, at the purchaser's option, to reissue the ticket for the correct fare. In this event, UA will also reimburse any reasonable, actual, and verifiable out-of-pocket expenses incurred by the purchaser in reliance upon the ticket purchase. The purchaser must provide receipts or other evidence of such actual costs incurred in support of any reimbursement request.

## RULE 5    CANCELLATION OF RESERVATIONS

A) UA has the right to cancel reservations (whether or not confirmed) of any Passenger whenever such action is necessary to comply with any governmental regulation, upon any governmental request for emergency transportation in connection with the national defense, or whenever such action is necessary or advisable by reason of weather or other conditions

beyond UA's control, (including, but not limited to acts of God, force majeure events, strikes, civil commotions, embargoes, wars, hostilities, or other disturbances, whether actual, threatened, or reported).

B)  UA has the right to cancel reservations (whether or not confirmed) due to the Passenger's failure to comply with the rules set forth herein, including but not limited to, the Passenger's failure to pay for the applicable Ticket under the conditions applicable to the fare for such travel.

C)  Failure to Occupy Space - If a Passenger fails to occupy space which has been reserved for him/her on a flight of UA and UA fails to receive notice of the cancellation of the reservation before the departure, or if any carrier cancels the reservation of any Passenger, UA may cancel all reservations (whether or not confirmed) held by such Passenger on the flights of UA or any carrier for continuing or return space.

D)  Check-In Time Limits - UA has the right to cancel reservations (whether or not confirmed), deny boarding and/or refuse the acceptance of checked baggage of any Passenger who fails to present himself/herself within the applicable check-in or loading gate time limits for Passengers and/or Baggage.

   1)  Domestic flights, except those departing Guam:

      a)  Passenger must complete the purchase of the ticket(s), check-in, check baggage, and obtain a boarding pass at least 60 minutes prior to scheduled departure.

      b)  All Passengers must be present at the loading gate for boarding at least 15 minutes prior to scheduled departure. NOTE:  If the Passenger's itinerary includes an international destination, the international time limits in D) 2) below apply to all flights in the itinerary.

   2)  All non-stop International flights (including flights departing Guam and St. Thomas, U.S. Virgin Islands):

      a)  Passenger must complete the purchase of the ticket(s), check-in, check baggage, and obtain a boarding pass at least 75 minutes prior to scheduled departure.
      EXCEPTIONS:

         (i)  In the Philippines, Passenger must complete check-in, check baggage and obtain a boarding pass at least 60 minutes prior to scheduled departure.

         (ii)  Within the Federated States of Micronesia; Republic of the Marshall Islands; Commonwealth of the Northern Mariana Islands; Republic of Palau; Canada; St. Thomas, U.S. Virgin Islands; Accra, Ghana; Lagos, Nigeria; and Tel Aviv, Israel, Passengers must complete check-in, check baggage and obtain a boarding pass at least 90 minutes (1 hour, 30 minutes) prior to scheduled departure.

      b)  All Passengers must be at the loading gate for boarding at least 30 minutes prior to scheduled departure. EXCEPTIONS: Within the Federated States of Micronesia, Republic of the Marshall Islands, and Brussels, Belgium, Passengers must be at the loading gate for boarding at least 60 minutes (1 hour) prior to scheduled departure.

E)  The time limits provided by UA in this Rule are minimum time requirements.  Passenger and baggage processing times may differ from airport to airport.  It is the Passenger's responsibility to arrive at the airport with enough time to complete any ticketing, check-in, baggage and security screening processes, and boarding requirements within these minimum time limits. NOTE: Please see www.united.com for more information.

F)  UA is not liable for any consequential, compensatory, or other damages when it cancels reservations (whether or not confirmed) of any Passenger in accordance with this Rule, but if the reservation was canceled according to paragraph A) of this Rule, see Rule 24.

G)  All of UA's flights are subject to overbooking which could result in UA's inability to provide previously confirmed reserved space for a given flight or for the class of service reserved.  In that event, UA's obligation to the Passenger is governed by Rule 25.

H)  In addition to exercising any of its remedies in Rule 6 K) below, UA reserves the right to cancel bookings and/or reservations which it deems fraudulent, abusive, illogical, fictitious, which are booked and/or reserved with no intention of flying, or for which the passenger makes a misrepresentation without notice to the passenger or the individual making the booking. The types of improper reservations that UA will cancel without notice include, but are not limited to: reservations made without having been requested by or on behalf of the named passenger; reservations made to hold or block seats for the purpose of obtaining lower fares, MP award inventory, travel certificates, or upgrades that may not otherwise be available; reservations made to manipulate, abuse, or circumvent any of UA's fare rules, policies or provisions; reservations made for the same passenger on flights traveling on or about the same date between one or more of the same or nearby origin or destination cities; reservations made for flights that are or likely will be delayed or cancelled with the intention of making a claim against or receiving a benefit from United concerning the flight delay; reservations where UA suspects credit card fraud or other fraud related to payment; and reservations with connections that depart before the arrival on the inbound flight.

**RULE 6     TICKETS**

A)   When more than one Ticket must be issued to properly reflect all of the information required for a complete flight itinerary, the individual Tickets will be cross-referenced by their Ticket numbers and are considered to be a single Ticket or "Conjunction Ticket."

B)   A Ticket will not be issued, and in any case UA will not be obligated to carry any Passenger until the Passenger has paid the applicable fare or has complied with credit arrangements established by UA.

C)   No person will be entitled to transportation except upon presentation of a valid Ticket.

D)   Lost Tickets.  See Rule 27 F).

E)   A Ticket which has not been validated or which has been altered, mutilated, or improperly issued, is not valid.

F)   Flight Coupons will be honored only in the order in which they were intended to be used and, in the case of written Tickets, only if all unused Flight Coupons and Passenger Coupons are presented together.

G)   Tickets are not transferable unless otherwise stated on the Ticket at the time it was issued. The purchaser of a Ticket and/or the Passenger intending to use such Ticket is responsible for ensuring that the Ticket accurately states the Passenger's name. Presentation of a Ticket by someone other than the ticketed Passenger renders the Ticket void, and UA is not liable to the owner of a ticket for honoring or refunding such ticket when presented by another person.  If a Ticket is in fact used by an unauthorized person with or without the knowledge or consent of the person to whom the Ticket was issued, UA will not be liable for the destruction, damage, or delay of such unauthorized person's baggage or other personal property, or for the death or injury of such unauthorized person arising from or in connection with such unauthorized use.  As used herein, "unauthorized person" means any person other than the person to whom the ticket is issued and who is entitled to be transported or to a refund in accordance with the rules in this Contract of Carriage.

H)   A Ticket will be valid only for flight(s) for which reservation(s) have been made and only between the points named on the ticket or applicable Flight Coupons.  A Passenger holding an unused open-date Ticket or portion thereof or Exchange Order for onward travel, or who wishes to change a ticketed reservation to another date, shall not be entitled to any preferential right with respect to the obtaining of reservations.

I)   Passengers Occupying Two Seats – Upon request, or if determined necessary by UA, and given availability, a Passenger will be permitted to the exclusive use of two seats subject to the payment of two applicable fares for the points between which the two seats will be used.  A Ticket will be issued for each seat and the normal Checked Baggage Allowances will apply in connection with each such Ticket presented to UA. The carry-on allowance is limited to the allowance for one individual.

J)   Prohibited Practices:

    1)   Fares apply for travel only between the points for which they are published.  Tickets may not be purchased and used at fare(s) from an initial departure point on the Ticket which is before the Passenger's actual point of origin of travel, or to a more distant point(s) than the Passenger's actual destination being traveled even when the purchase and use of such Tickets would produce a lower fare.  This practice is known as "Hidden Cities Ticketing" or "Point Beyond Ticketing" and is prohibited by UA.

    2)   The purchase and use of round-trip Tickets for the purpose of one-way travel only, known as "Throwaway Ticketing" is prohibited by UA.

    3)   The use of Flight Coupons from two or more different Tickets issued at round trip fares for the purpose of circumventing applicable tariff rules (such as advance purchase/minimum stay requirements) commonly referred to as "Back-to-Back Ticketing" is prohibited by UA.

    4)   The failure to comply with applicable stayover requirements, the failure to meet the purpose or status requirement associated with the Ticket's fare category, and the purchase or use of a Ticket that UA determines circumvents the applicable fare rules.

    5)   Obtaining a ticket, service, product, or refund through fraudulent or deceptive means, including but not limited to by credit card or other payment fraud, whether actual or suspected, by submitting a chargeback for services that have been rendered, or by submitting fraudulent documentation.

    6)   Any practice that United believes, in its sole discretion, is exploitative, abusive or that manipulates/bypasses/overrides United's fare and ticket rules.

K)   UA's Remedies for Violation(s) of Rules - Where a Ticket is booked, held, purchased and/or used in violation of the law, these rules or any fare rule (including Hidden Cities Ticketing, Point Beyond Ticketing, Throwaway Ticketing, or Back-to-Back Ticketing), UA, without notice to the passenger, has the right in its sole discretion to take all actions permitted by law, including but not limited to, the following:

    1)   Invalidate the Ticket(s);

2) Cancel any remaining portion of the Passenger's itinerary, Ticket, or Flight Coupon and/or void out any associated electronic travel certificate or credit;

3) Confiscate any unused Flight Coupons until the amount reflected in 5) below is collected;

4) Permanently ban or refuse to board the Passenger and to carry the Passenger's baggage, unless the difference between the fare paid and the fare for transportation used is collected prior to boarding;

5) Assess the Passenger any amounts owed to UA, including but not limited to for seat blocking, for the actual value of the service or ancillary product, and for the full value of a Ticket, which shall be the difference between the lowest fare applicable to the Passenger's actual itinerary and the fare actually paid, including after the transportation or service have been provided;

6) Delete miles, points, credits or any other benefits in or related to the Passenger's frequent flyer account (UA's MileagePlus Program), revoke the Passenger's Elite status, if any, in the MileagePlus Program, terminate the Passenger's participation in the MileagePlus Program, terminate any other air transportation agreement between UA and the Passenger, or take any other action permitted by the MileagePlus Program Rules in UA's "MileagePlus Rules;"

7) Charge a delivery fee and penalty, set at United's discretion, to send Checked Baggage to the Passenger; and

8) Take legal action with respect to the Passenger.

L) UA may mandate the issuance of an e-Ticket regardless of market, carrier, form of payment, or customer type (including mileage plus and participating carrier frequent flyer members). In addition to all applicable charges, UA will assess a 50.00 USD fee for issuance of a paper ticket.

M) UA will assess a 50.00 USD/50.00 CAD fee to assist with a voluntary change on tickets originally issued via any external ticketing source (travel agency, internet agency, other airline, etc.). The fee is non-refundable and applies in addition to all applicable charges.

N) Within the 50 U.S. States and Canada, UA will assess a 50.00 USD/50.00 CAD charge for tickets purchased at any airport location, a 25.00 USD/25.00 CAD charge for tickets purchased through Contact Centers, and a 30.00 USD/30.00 CAD charge for tickets purchased or changed through a City Ticket Office. Charges may vary outside the 50 U.S. States and Canada. These booking service charges are non-refundable and apply in addition to all applicable charges.

O) Unless prohibited by local law, UA may restrict acceptable forms of payment for its tickets, products, or services to debit or credit card.

**RULE 7    TICKET VALIDITY PERIOD**

A) Nonrefundable Fares: Nonrefundable fares have no value after ticketed departure time. <u>EXCEPTION</u>: When the Passenger cancels the ticketed flight reservations prior to the ticketed departure time, the period of validity for that ticket applies.

B) Period of Validity - Except as otherwise provided in this Rule or required by the applicable local law of a foreign jurisdiction, any eligible Ticket issued by UA or its authorized agent on UA Ticket Stock must begin travel within one year from the date of issuance and will be valid for transportation for one year from the date on which transportation commences at the point of origin as designated on the original Ticket or, if no portion of the Ticket is used, one year from the date of issuance of the original Ticket. When an unused fare Ticket is completely exchanged, the original ticket validity applies. When fares are combined to create Round/Circle/Open-Jaw Trips, the most restrictive provisions will apply to the entire transportation.

C) Extension of Validity Period:

1) If the Passenger is prevented from using the Ticket, or a portion thereof during the period of validity specified in this Rule due to a UA flight cancellation or because UA is unable to provide space on the flight, UA will, without additional collection of fare, extend the ticket validity period of such Passenger's Ticket until the first flight of UA on which space is available in the class of service for which the fare has been paid.

2) If a Passenger is unable to commence or continue travel because of the death or serious illness of the Passenger, the Passenger's immediate family member(s), or the Passenger's traveling companion(s), UA may, in its sole discretion, waive or refund any applicable change fees associated with changing the ticket(s). See Rule 27 or visit UA's website, www.united.com, for details regarding UA's Refund Policy.

D) Waiver of Minimum Stay Requirements - Special Fare - In the event of the death of a Passenger enroute, the minimum stay and group travel requirements with regard to any special fares will be waived for Passengers who are immediate family members of the deceased Passenger or were otherwise actually accompanying the deceased Passenger, on the following conditions:

1) The ticket must be endorsed "earlier return on account of death of (name of Passenger)"; and

13

2)   A copy of the death certificate duly executed by the competent authorities under the applicable laws of the country in which death has occurred must be presented to UA at the time of reticketing.  Passengers will be accommodated under this provision only in the class of service originally ticketed.

Note:  If the death certificate is not available at the time the Passenger requests reticketing under this provision, or if documentation satisfactory to UA has not been provided, the Passenger(s) requesting reticketing will be accommodated only upon payment of the fare applicable to transportation actually used and a request for a refund may later be filed with UA with the documents required.  Upon receipt of the request for a refund and all supporting documents, UA will determine whether a refund to the Passenger is appropriate.  If so, the maximum refund will be the difference between the total fare paid by the Passenger and the amount such Passenger would have paid if a waiver had been originally furnished under the provisions of this Rule.

E)   Ticket Issue Date - The date when payment is made by credit card, or the ticket invoice date established when payment is made by other acceptable form of payment, will constitute the date a Ticket is "issued" in determining the validity period under this Rule.

## RULE 8    RETURNED CHECK CHARGE

UA will collect 25 USD/25 CAD for each returned check.  This charge is non-refundable and is not subject to any discount.

## RULE 9    DELETED

## RULE 10    TRANSATLANTIC SURCHARGES

For details concerning transatlantic surcharges, see UA's International Fare service surcharges filed with ATPCO referencing this Rule.

## RULE 11    PACIFIC SURCHARGES

For details concerning transpacific surcharges, see UA's International Fare service surcharges filed with ATPCO referencing this Rule.

## RULE 12    WESTERN HEMISPHERE SURCHARGES

For details concerning Western Hemisphere surcharges, see UA's International Fare service surcharges filed with ATPCO referencing this Rule.

## RULE 13    ACCEPTANCE OF CHILDREN/MINORS AND INFANTS

A)   Children/Minors/Infants Traveling Accompanied

1)   Children under the age of twelve (12) must be "accompanied" by an Adult Passenger or the child's Parent/Legal Guardian on the same flight and in the same compartment.  UA reserves the right to require and charge the applicable service charge for Unaccompanied Minor service when a child age five (5) to fourteen (14) is traveling with a passenger who is not at least 18 years old or the child's Parent/Legal Guardian.

2)   United does not accept infants in incubation (except as permitted under Rule 15C) or infants under seven days old.

3)   Lap Children (infants under the age of two years):

a)   Additional infants under the age of two years must occupy a seat and be ticketed at the applicable adult fare.

b)   Infants under the age of two years for whom a seat at the applicable adult fare has not been purchased, may not occupy a seat.

NOTE:  Infants who are carried in an adult's lap do not require a Ticket for domestic travel.  Infants traveling internationally and to and from Canada require a Ticket, which may be discounted off of the applicable fare.  In many cases a Ticket is required for an infant to travel on international flights even if no fare is paid.  In addition, some international destinations may carry service charges.  A USD 0 value or fee only Ticket may be issued for an infant.

4)   Children who have reached their second birthday are required to purchase a seat and occupy a seat with a separate seat belt.  Infants reaching their second birthday after outbound flights will be required to purchase a Ticket and occupy a seat for the entirety of their itinerary regardless of whether or not they have reached their second birthday on the outbound flight.

5)   Infant/child Seats:  Children unable to sit upright with the seat belt fastened must be carried in an approved infant/child seat, if not being held by an Adult Passenger as a lap child.  Infant/child seats:

a)   Must be FAA approved and be clearly marked with the original NHTSA label, must be approved by a foreign government with a label showing that the seat was manufactured under the standards of the United Nations, or must conform to the Canadian Motor Vehicle Safety Standard (CMVSS) 213 or 213.1 whereby a label of compliance must be affixed to the seat indicating compliance with the same.

14

b) Must be used in unoccupied aircraft seats and cannot be held in an adult's lap.

c) Cannot be used in an Exit Row.

d) Must remain properly secured to an aircraft seat at all times unless stored as a carry-on.

6) Proof of age may be required by UA for any child, minor, or infant traveling accompanied.

B) Children/Minors Traveling Unaccompanied

1) UA requires Unaccompanied Minor service for children/minors age five (5) to fourteen (14) who are not accompanied by a passenger who is at least 18 years old or a Parent/Legal Guardian. The policies for UA's Unaccompanied Minor service apply only to non-stop flights operated by UA and Carriers doing business as United Express. UA does not offer unaccompanied minor service to or from other carriers.

2) Unaccompanied children under five (5) years of age are not accepted on flights operated by UA and Carriers doing business as United Express.

3) UA's Unaccompanied Minor service is mandatory for unaccompanied children age five (5) to fourteen (14) years old. For minors age fifteen (15) through seventeen (17) for whom UA's Unaccompanied Minor service is not purchased, UA will assume no financial or guardianship responsibilities beyond those applicable to an adult Passenger.

4) Unaccompanied children/minors must be brought to the airport of departure by a parent, legal guardian, or responsible adult 30 minutes early (in addition to regular airport processing times shown for the airport). This parent, legal guardian, or responsible adult shall remain with the unaccompanied child(ren)/minor(s) until the unaccompanied child(ren)/minor(s) has boarded and the plane is airborne, and who shall confirm that the unaccompanied child(ren)/minor(s) will be met by another parent, legal guardian, or responsible adult upon deplaning at the final destination and shall furnish UA with that individual's name, address, and phone number(s).

5) The parent, legal guardian, or responsible adult receiving the unaccompanied child(ren)/minor(s) upon deplaning at the final destination may be required to present a government-issued photo ID that matches the name and address provided by the parent or guardian who delivered the child to the departure airport, and may also be required to complete and sign documentation relating to such unaccompanied child(ren)/minor(s). UA reserves the right to refuse to release an unaccompanied minor to anyone other than the pre-designated individual.

6) When two or more unaccompanied minors are traveling together, the most restrictive age requirement will apply.

7) Proof of age may be required by UA.

C) Unaccompanied Minor Service Charge

1) Service charges for Unaccompanied Minor service is subject to change at UA's discretion. The fare for Unaccompanied Minor service for children age five (5) to fourteen (14) years old includes the applicable adult fare in addition to a service charge of 150 USD/150 CAD assessed for each one-way journey from the child's boarding point to the child's final destination. One service charge assessed for each one-way journey applies to two or more children traveling together on the same reservation.

2) For purposes of this Rule, Unaccompanied Minor service includes reasonable supervision for Unaccompanied Minors from boarding until deplaning at the final destination.

## RULE 14  SPECIAL SERVICES

A) Definition of Non-Ambulatory under this Rule:

1) Persons who are unable to move themselves or need the support of another person to walk or move, but who are otherwise capable of caring for themselves without assistance throughout the flight are considered Non-Ambulatory.

2) If a Passenger uses a wheelchair for convenience, the Passenger is not considered to be Non-Ambulatory.

3) A child or infant is not considered to be Non-Ambulatory merely because of his/her age, except when requiring an Infant Transport System.

4) If the Passenger can move himself/herself from his/her seat to the nearest emergency exit without the aid of another person, the Passenger is not considered to be Non-Ambulatory, regardless of the degree of impairment.

B) Qualifications for Acceptance of Non-Ambulatory Passengers - Non-Ambulatory Passengers are accepted when accompanied by an assistant able to assist the Non-Ambulatory Passenger to evacuate the aircraft in accordance with 14 CFR Part 382.29. See Rule 21.

C) Qualified Individual with a Disability - UA requires a Passenger, including a Qualified Individual with a Disability, to provide up to 48 hours' advance notice and check-in one hour before the check-in time for the general public for Domestic U.S. flights and for International flights as set forth in Rules 5 D) and 5 E) if such Passenger wishes to receive any of the following service accommodations:

1) Transportation of an electric wheelchair on an aircraft with fewer than 60 seats.

15

2) Provision by UA of hazardous materials packaging for a battery for a wheelchair or other assistive device.

3) Accommodation for a group of ten or more Qualified Individuals with Disabilities who make reservations and travel as a group.

4) Provision of an on-board wheelchair on an aircraft with more than 60 seats that does not have an accessible lavatory.

5) Provision by UA of carrier-supplied in-flight medical oxygen (if applicable).

6) Use of a ventilator, respirator, Continuous Positive Airway Pressure (CPAP) machine, or Passenger's own Personal Oxygen Concentrator (POC).

Qualified Individuals with a Disability traveling with Service Animals must comply with the requirements of Rule 16.

D) When Travel Assistance is Required:

1) If UA determines that an assistant is essential for safety, UA may require that a Passenger, including a Qualified Individual with a Disability, meeting any of the following criteria travel with an assistant as a condition of being provided air transportation:

a) A person who, because of a mental disability, is unable to comprehend or respond appropriately to safety instructions from UA personnel, including the safety briefing required by 14 CFR, Part 121.571(a)(3), (a)(4) and 135.117(b);

b) A person with a mobility impairment so severe that the person is unable to physically assist in his or her evacuation of the aircraft; or

c) A person who has both severe hearing and severe vision impairments if the person cannot establish some means of communication with UA personnel adequate to permit the transmission of the required safety briefing.
NOTE: If UA determines that a person meeting the criteria in subparagraphs (a), (b) or (c) above must travel with an assistant, contrary to the individual's self-assessment that he/she is capable of traveling independently, UA will not charge for the transportation of the assistant.
EXCEPTION: For Passengers traveling to/from Canada, UA will accept a disabled person's determination of his/her self-reliance.

NOTE: Flight attendants and other crew members cannot assist with any medical services, assistance inside the lavatory, or in actual feeding.

2) If, because there is not a seat available on a flight for an assistant whom UA has determined to be necessary, a Qualified Individual with a Disability with only one confirmed reservation is unable to travel on the flight, the Qualified Individual with a Disability shall be eligible for denied boarding compensation in accordance with Rule 25. For purposes of determining whether a seat is available for an assistant, the assistant shall be deemed to have checked in at the same time as the Qualified Individual with a Disability.

E) For Rules regarding wheelchairs, see Rules 23 and 28.

## RULE 15  MEDICAL SERVICES

A) Onboard Medical Oxygen Service - UA may provide on-board medical oxygen service when requested in advance and only in limited markets in the Micronesia area. Passengers requesting on-board medical oxygen service will be required to give UA a minimum 48 hours advance notice and check-in one hour before the check-in time for the general public for Domestic U.S. and International flights as set forth in Rule 5 D) and E). Contact UA to verify availability and additional conditions of service. UA is not liable for failure to provide this service in emergency or other circumstances beyond its control.

B) Passenger-Provided Portable Oxygen Concentrators - Portable oxygen concentrators (POCs) approved by the Federal Aviation Administration (FAA) may be carried and used on board flights operated by UA worldwide, at no charge, in accordance with specific FAA requirements. Passengers utilizing POCs are required to give UA a minimum 48 hours advance notice and check-in one hour before the check-in time for the general public for Domestic U.S. and International flights as set forth in Rule 5 D) and E) and must also meet the following conditions:

1) Check www.united.com for a list of specific POCs currently approved by the FAA.

2) Non-approved POC brands and models that do not contain compressed or liquid oxygen may be carried in the cabin if they meet United's carry-on size and weight requirements. Alternatively, they may be transported as checked baggage. UA may accept other brands and models for use on board in the future as they become approved by the FAA and UA.

3) Passengers must satisfy specific requirements prior to boarding the aircraft. The Passenger must:

a) provide advance notice in the reservation record that he/she is planning to use a POC on board the flight.

b) have a signed written Doctor's statement that:

16

(i)    states the user of the POC has the physical and cognitive ability to see, hear and understand the device's aural and visual cautions and warnings and is able, without assistance, to take appropriate action in response to those cautions and warnings.

(ii)    states whether or not oxygen use is medically necessary for all or a portion of the flight(s) listed on the Passenger's itinerary.

(iii)    specifies the maximum oxygen flow rate in liters per minute corresponding to the pressure in the cabin of the aircraft under normal operating conditions.

(iv)    may be reviewed at the airport prior to boarding and must be kept by the Passenger and provided upon request by UA personnel at any time during travel. Passengers may use and print out the Medical Verification Statement available on UA's website, www.united.com.

c)    ensure that he/she has ample batteries to power the POC for the duration of his/her flight plus 3.0 additional hours to allow for unanticipated delays and any ground connection time where the POC is planned to be used. (NOTE: aircraft in -seat electrical power is not available for Passenger use with POCs).

d)    ensure that all extra batteries are properly protected from short circuiting by either:

(i)    having recessed battery terminals or;

(ii)    packing them so that the batteries do not contact metal objects including the terminals of other batteries.

4)    Failure to meet the requirements will result in denied use of the POC during travel. Passengers planning on traveling with POCs are solely responsible for advising UA as soon as reservations are confirmed, regardless of whether the reservations were made through a travel agent, on the internet or directly with UA, in order to confirm specific requirements and to provide the airline with required information.

5)    When travelling on or connecting to or from any flight other than a UA or a United Express flight, the Passenger is responsible for notifying and making independent arrangements directly with the other airline.

6)    POCs are assistive devices for Passengers with disabilities. As such, they do not count toward carry-on or checked baggage limits, whether or not they are used on board. They must be able to fit underneath the seat or in an overhead storage compartment. A Passenger using a POC may not sit in an exit row or bulkhead seat. Additionally, a Passenger using a POC during takeoff and landing may not sit in an aisle seat.

7)    UA is not liable for POC equipment failures, failure of the batteries that power the POC, or any other losses or damages alleged by the Passenger or any other person arising out of the use or possession of the POC, unless caused by the gross negligence or willful misconduct of UA.

C)    Medical Transport Services - These services are limited and provided only in the Micronesia region. Passengers must provide 48 hours' advance notice for these services (UA will make reasonable efforts to accommodate Passengers who fail to meet the 48-hour reservation/notification requirement, but will not be obligated to do so). Subject to UA's approval based upon the availability of space, appropriate equipment, aircraft type, and pursuant to the following conditions:

1)    Passengers on Stretchers

a)    Passenger must comply with UA's medical procedures;

b)    Passenger must pay for all seats required for stretcher transportation as determined by UA;

c)    Passenger must be accompanied by two assistants, provided at the Passenger's expense, one being a medical escort and the other a family member or guardian;

d)    The cost of ambulance service, hospitalization and other ground services shall be paid by the Passenger;

e)    The normal Baggage Allowance will apply to each fare paid; and

f)    The loading and unloading of the stretcher Passenger is the responsibility of the stretcher Passenger's assistants and must be arranged by the Passenger at his or her own expense.

2)    All necessary medical documentation must be completed and provided to UA prior to flight.

## RULE 16  SERVICE ANIMALS

A)    Service Animals: UA accepts for transportation, without charge, trained Service Animals for travel with a Qualified Individual with a Disability who requires the animal to assist them in the performance of necessary activities. The animal will be permitted to accompany the Passenger in the cabin, if it meets the conditions of acceptance noted below.

1)    Conditions of Acceptance

a)    Other than for Search and Rescue Animals, the Passenger must submit to United a Service Animal Air Transportation Form that has been completed on or after the date the Passenger purchased the Ticket and at least 48 hours prior to scheduled departure. If the Ticket has been purchased less than 48 hours prior to departure, the Service Animal Transportation Form must be submitted to United prior to departure. Such form must be submitted to United in accordance with United's policies. Failure to provide United a fully and

17

accurately completed Service Animal Air Transportation Form as required by this paragraph may result in the Passenger's being denied transportation on the scheduled flight.

b) Evidence that an animal is a Service Animal include identification cards, other written documentation, the type of harness or markings on the harness, tags, or other credible assurances of the Qualified Individual with a Disability using the animal. UA, in its sole discretion, will determine if the evidence is sufficient.

c) Service Animals must be properly harnessed or leashed and remain under the direct control of the Passenger. A Service Animal in addition to its owner-Passenger will be denied boarding, removed from the flight by UA, and in UA's sole discretion, permanently banned if the animal is too large or heavy to be accommodated in the cabin in the space immediately in front of the Passenger, cannot be contained or controlled by the Passenger, or otherwise exhibits behavior that poses a threat to the health or safety of other passengers or a significant threat of disruption.

d) On a flight segment scheduled to take 8 hours or more, the Passenger with a Service Animal other than a Search and Rescue Animal must submit to United a Service Animal Relief Attestation Form that has been completed on or after the date the Passenger purchased the Ticket and at least 48 hours prior to scheduled departure. If the Ticket has been purchased less than 48 hours prior to departure, the Service Animal Transportation Form must be submitted to United prior to departure. Such form must be submitted to United in accordance with United's policies. Failure to provide United a fully and accurately completed Service Animal Relief Attestation Form as required by this paragraph may result in the Passenger's being denied transportation on the scheduled flight.

2) UA accepts for transportation, without charge, a properly harnessed dog trained in explosive detection, drug search, and rescue, or other specific functions, when accompanied by its handler on official emergency business as authorized by an appropriate federal, state, or local government agency. Such official duty status must be documented in writing to the satisfaction of UA. The dog will be permitted to accompany its handler into the cabin, but not to occupy a seat.

3) Local regulations at the Passenger's final or intermediate destination(s) may apply and impose further requirements or restrictions, including but not limited to, carriage in the passenger cabin, limitations on the designation of Service Animals to dogs only, or the non-recognition of animals as trained and qualified Service Animals.

4) Trainers are permitted to bring one Service Animal onboard free of charge that is training to assist disabled passengers. This service animal must not occupy a seat, and must meet all other conditions specified in this Rule.

B) Service Animals may not occupy a seat. Service Animals will be transported in the Passenger's lap or in the Passenger's foot space, unless this would be inconsistent with safety requirements set by the US Federal Aviation Administration, and may not encroach into another Passenger's foot space. If no other seat accommodation can be made and the animal is too big to fit safely in the cabin, the animal will be denied boarding, and as a result, this may require the Passenger to re-book his or her flight.

C) Passengers with Service Animals will not be seated in emergency exit rows. They may not obstruct an aisle or other area that must remain unobstructed in order to facilitate an emergency evacuation.

D) The Passenger affirms that to the best of his or her knowledge, the Service Animal has not behaved aggressively or caused serious injury to another person or dog and does not pose a threat to the health and safety of others, and assumes full responsibility for the safety, well-being, and conduct of its animal, including the interaction of the animal with crew and other Passengers or Passenger property that may come in contact with the animal while on board the aircraft, and for compliance with all UA and governmental requirements, regulations, or restrictions, including entry permits and required health certificates of the country, state, or territory from and/or to which the animal is being transported. Any Passenger or his or her Service Animal who, by failing to comply with this Section, causes UA or its passengers any loss, damage or expense of any kind, consents and acknowledges that he or she shall reimburse UA for any such loss, damage or expense.

**RULE 17   GROUND TRANSFER SERVICE**

A) UA may provide or procure ground transfer service between airports and city centers, between airports and any point in a Passenger's itinerary, or to places of lodging.

B) Except where ground transfer service is directly operated by UA, it is agreed that any such service is performed by independent operators. Such independent operators are not agents or servants of UA, and UA assumes no responsibility for the ground transfer of any passenger and/or his/her baggage. Anything done by an employee, agent or representative of UA in assisting the Passenger to make arrangements for such independent ground transfer service shall in no way make UA liable for the acts or omissions of such independent operator.

C) In cases where UA maintains and directly operates local transfer services for its Passengers, the terms, conditions, rules and regulations of UA, including but not limited to, those stated or to which reference is made in UA's Tickets, Baggage Checks and baggage valuation agreements shall be deemed applicable to such local ground transfer services. No portion of the air transportation fare shall be refundable in the event local ground services are not used by the Passenger.

**RULE 18  SERVICE PROVIDED BY UNITED EXPRESS AND OTHER CODESHARE PARTNERS**

A) UA has arrangements with certain other carriers to enable UA to provide Codeshare services to Passengers on flights operated by these carriers.  Transportation provided by UA under a Codeshare arrangement with these carriers is designated by a flight number that includes UA's two-letter airline designator code, "UA".  NOTE: For travel to or from the European Union and for reservations made in the European Union, UA will indicate the identity of the operating carrier at the time of reservation or as soon as administratively feasible.

B) For Codeshare services on flights operated by another carrier, UA is responsible for the entirety of the Codeshare journey for all obligations to Passengers established in these rules.  The rules contained herein with respect to ticketing will apply to UA Codeshare services on flights operated by partner airlines. Notwithstanding the foregoing, the baggage liability provisions set forth in Rule 28 shall govern the liability of UA with respect to any transportation subject to this Contract.

C) When another foreign or U.S. Codeshare partner operates a flight on which UA's designator code "UA" appears, the operating carrier's contingency plan for lengthy tarmac delays will apply to that flight.

**RULE 19  TRAVEL DOCUMENTS**

A) Each Passenger desiring transportation across any international boundary is responsible for obtaining prior to travel and presenting upon request at any time all necessary travel documents, which shall be in good condition, and for complying with the laws of each country flown from, through or into which he/she desires transportation.  Any Passenger who, by failing to comply with the laws of each country flown from, through or into which he/she desires transportation, causes UA any loss, damage or expense of any kind, consents and acknowledges that he or she shall reimburse UA for any such loss, damage or expense. UA is not liable for any assistance or information provided by any employee or agent of UA to any Passenger relating to such documents or compliance with such laws, or for the consequences to any Passenger resulting from his/her failure to obtain and present such documents, which shall be in good condition, or to comply with such laws.  Where legally permitted, UA reserves the right to hold, photocopy or otherwise reproduce a travel document presented by any Passenger.  UA also reserves the right to deny boarding to any Passenger whose necessary travel documents are not in good condition according to UA's reasonable belief, or which otherwise do not comply with laws of the specific country the Passenger is departing from, transiting through, or traveling to.

B) Subject to applicable laws and regulations, the Passenger must pay the applicable fare whenever UA, on government order, is required to return a Passenger to his/her point of origin or elsewhere due to the Passenger's inadmissibility into/or deportation from a country. The fare will be the applicable fare in effect at the time of the rebooking for the return travel.  Any difference between the applicable fare and the fare paid will be collected from the Passenger.  UA will apply to the payment of such fares any funds or miles paid by the Passenger for unused carriage or any funds or miles of the Passenger in possession of or accessible/available to UA.  The fare collected for carriage to the point of refusal of entry or deportation, as well as for return travel, will not be refunded by UA unless the law of such country requires that the fare be refunded.

C) This Rule and its limitations include, but are not limited to, Travel Documents related to travel by minors. Parents/guardians of minors are responsible for compliance with all requirements and procedures for minors travelling internationally, including, but not limited to documentary evidence, such as a notarized letter of relationship and permission for the minor's travel from the parent or legal guardian not present.

**RULE 20  SCREENING OF PASSENGERS AND BAGGAGE**

Passengers and/or their baggage are subject to security screening, including but not limited to, security profiling, physical pat-downs and inspections, x-ray screening, manual bag searches, questioning of Passengers, and use of electronic or other detectors or screening or security devices, in the sole discretion of the government, airport or UA, and with or without the Passenger's presence, consent or knowledge. Neither UA nor its employees or agents is liable for any damage, loss, delay (including refusal to transport), confiscation of property, injury or other harm relating to or arising out of security screening conducted by an agent of the airport or any local, state, or federal agency or a Passenger's failure to submit to or comply with such security screening.

**RULE 21  REFUSAL TO TRANSPORT**

UA shall have the right to refuse transport on a permanent or temporary basis or shall have the right to remove from the aircraft at any point, any Passenger for the following reasons:

A) Breach of Contract of Carriage – Failure by Passenger to comply with the Rules of the Contract of Carriage.

B) Government Request, Regulations or Security Directives – Whenever such action is necessary to comply with any government regulation, Customs and Border Protection, government or airport security directive of any sort, or any governmental request for emergency transportation in connection with the national defense.

C)  Force Majeure and Other Unforeseeable Conditions – Whenever such action is necessary or advisable by reason of weather or other conditions beyond UA's control including, but not limited to, acts of God, force majeure, strikes, civil commotions, embargoes, wars, hostilities, terrorist activities, or disturbances, whether actual, threatened, or reported.

D)  Search of Passenger or Property – Whenever a Passenger refuses to submit to electronic surveillance or to permit search of his/her person or property.

E)  Proof of Identity – Whenever a Passenger refuses on request to produce identification satisfactory to UA or who presents a Ticket to board and whose identification does not match the name on the Ticket.  UA shall have the right, but shall not be obligated, to require identification of persons purchasing tickets and/or presenting a ticket(s) for the purpose of boarding the aircraft.

F)  Failure to Pay – Whenever a Passenger has not paid the appropriate fare for a Ticket, Baggage, or applicable service charges for services required for travel, has not paid an outstanding debt or Court judgment, or has not produced satisfactory proof to UA that the Passenger is an authorized non-revenue Passenger or has engaged in a prohibited practice as specified in Rule 6.

G)  Across International Boundaries – Whenever a Passenger is traveling across any international boundary if:

  1)  The government required travel documents of such Passenger appear not to be in order according to UA's reasonable belief; or

  2)  Such Passenger's embarkation from, transit through, or entry into any country from, through, or to which such Passenger desires transportation would be unlawful or denied for any reason.

H)  Safety – Whenever refusal or removal of a Passenger may be necessary for the safety of such Passenger or other Passengers or members of the crew including, but not limited to:

  1)  Passengers or Passengers' Service Animals whose conduct is unlawful; indecent, lewd, or sexual in nature; harassing; disruptive; disorderly; offensive; abusive; unsanitary; or violent;

  2)  Passengers who fail to comply with or interfere with the duties of the members of the flight crew, federal regulations, or security directives;

  3)  Passengers who assault any employee of UA, including the gate agents and flight crew, any employees of carriers doing business as United Express, any UA or United Express vendor employee, or any UA Passenger;

  4)  Passengers who, through and as a result of their conduct, cause a disturbance such that the captain or member of the cockpit crew must leave the cockpit in order to attend to the disturbance;

  5)  Passengers who are barefoot, not properly clothed, or whose clothing is lewd, obscene or offensive;

  6)  Passengers who appear to be intoxicated or under the influence of drugs (other than a qualified individual whose appearance or involuntary behavior may make them appear to be intoxicated or under the influence of drugs);

  7)  Passengers wearing or possessing on or about their person concealed or unconcealed deadly or dangerous weapons; provided, however, that UA will carry law enforcement personnel who meet the qualifications and conditions established in 49 C.F.R. §1544.219;

  8)  Passengers who are unwilling or unable to follow UA's policy on smoking or use of other smokeless materials;

  9)  Unless they comply with Rule 6 I), Passengers who are unable to sit in a single seat with the seat belt properly secured, and/or are unable to put the seat's armrests down when seated and remain seated with the armrest down for the entirety of the flight, and/or passengers who significantly encroach upon the adjoining passenger's seat;

  10) Passengers who are manacled or in the custody of law enforcement personnel;

  11) Passengers who have resisted or may reasonably be believed to be capable of resisting custodial supervision;

  12) Pregnant Passengers in their ninth month, unless such Passenger provides a doctor's certificate dated no more than 72 hours prior to departure stating that the doctor has examined and found the Passenger to be physically fit for air travel to and from the destination requested on the date of the flight, and that the estimated date of delivery is after the date of the last flight;

  13) Passengers who are incapable of completing a flight safely, without requiring extraordinary medical assistance during the flight, and Passengers who appear to have symptoms of or have a communicable disease (or there is reason to believe there was exposure to a communicable disease) or other condition that could pose a direct threat to the health or safety of themselves or others on the flight, or who refuse a medical screening for such disease or condition, whether suspected or actual.  (NOTE:  UA requires a medical certificate for Passengers who wish to travel under such circumstances.  Visit UA's website, www.united.com, for more information regarding UA's requirements for medical certificates);

  14) Passengers who fail to travel with the required safety assistant(s), advance notice and/or other safety requirements pursuant to Rules 14 and 15;

  15) Passengers who do not qualify as acceptable Non-Ambulatory Passengers (see Rule 14);

20

16) Passengers who have or cause a malodorous condition (other than individuals qualifying as disabled);

17) Passengers whose physical or mental condition is such that, in United's sole opinion, they are rendered or likely to be rendered incapable of comprehending or complying with safety instructions without the assistance of an escort. The escort must accompany the escorted passenger at all times;

18) Unaccompanied passengers who are both blind and deaf, unless such passenger is able to communicate with representatives of UA by either physical, mechanical, electronic, or other means. Such passenger must inform UA of the method of communication to be used;

19) Passengers who are unwilling to follow UA's policy that prohibits voice calls after the aircraft doors have closed, while taxiing in preparation for takeoff, or while airborne;

20) Passengers who refuse to wear a mask or face covering while at the airport and/or onboard UA and United Express flights if UA or United Express believe, in their sole discretion, that a failure to wear such a mask or facial covering may pose a risk to the health or safety of others; and

21) Passengers flying into the U.S. from a foreign country or from a foreign country into the U.S. who: i) refuse to provide proof of full vaccination, ii) proof of a negative pre-departure test result for COVID-19, and iii) contact tracing information within 72 hours of their flight's departure, the sufficiency of which for each of the three items is subject to UA's approval.

I) Any Passenger who, by reason of engaging in the above activities in this Rule 21, causes UA any loss, damage or expense of any kind, consents and acknowledges that he or she shall reimburse UA for any such loss, damage or expense. UA has the right to refuse transport, on a permanent basis, any passenger who engages in any of the activities in this Rule. In addition, the activities enumerated in this Rule shall constitute a material breach of contract, for which UA shall be excused from performing its obligations under this contract.

J) UA is not liable for its refusal to transport any passenger or for its removal of any passenger in accordance with this Rule. A Passenger who is removed or refused transportation in accordance with this Rule may be eligible for a refund upon request. See Rule 27 A). As an express precondition to issuance of any refund, UA shall not be responsible for damages of any kind whatsoever. The passenger's sole and exclusive remedy shall be Rule 27 A).

## RULE 22   SMOKING POLICY

Smoking (including use of electronic simulated smoking materials and smokeless cigarettes) is not permitted on any flights operated by UA. Use of betel nut (i.e., betel chewing) or any other type of chewing tobacco is also prohibited on all flights operated by United. Federal law also prohibits smoking in an airplane lavatory and tampering with, disabling, or destroying any smoke detector installed in any airplane lavatory. Federal law provides for a penalty of up to $2,000 for tampering with the smoke detector installed in this lavatory. Individuals are subject to FAA enforcement action and substantial monetary penalties for violation of this law and related regulations. By purchasing a ticket or accepting transportation, the Passenger agrees to comply with UA's policy on smoking and use of other smokeless materials, as well as applicable federal law, and UA reserves the right to seek reimbursement from any Passenger whose failure to do so causes UA any loss, damage or expense.

## RULE 23   BAGGAGE

A) General Conditions of Acceptance - Passengers may check Baggage for carriage in the cargo compartment of the aircraft and/or may carry Baggage on board the aircraft subject to provisions in this Rule. UA will accept Baggage subject to the following conditions:

1) Passengers must present a valid Ticket for transportation over the lines of UA or over the lines of UA and one or more other carriers with which UA has an Interline Transportation agreement.

2) UA has the right to refuse to transport Baggage on any flight other than the one carrying the Passenger.

3) UA will refuse to accept property for transportation when the size, weight, character or type of packaging renders it unsuitable for transportation on the particular aircraft which is to transport it, or when the property cannot be accommodated without harming or annoying Passengers or which poses a risk to other baggage or cargo, or which is not suitable or adequately packed to withstand ordinary handling, unless the passenger executes a release form.

4) All Baggage or other property for which UA assumes custody and for which it issues a Baggage Claim Check shall be deemed acceptable for transportation by air.

5) Baggage will not be checked:

a) To a point that is not on the Passenger's Routing;

b) Beyond the Passenger's next point of Stopover or, if there is no Stopover, beyond the final Destination of the Ticket;

c) Beyond a point to which all applicable charges have been paid;

21

d) Beyond a point at which the Passenger is to Transfer to a connecting flight, if that flight is scheduled to depart from an airport different from the one at which the Passenger is scheduled to arrive; or

e) To an intermediate point unless the intermediate point to which the Baggage is to be checked is a permissible Stopover point or a scheduled layover at the fare paid (except if the Passenger is making a connection to the first available UA flight departing from such intermediate point and the connection exceeds four hours, the Passenger may reclaim his/her Baggage at such intermediate connecting point). This section e) does not apply if a Passenger's routing is affected by a Schedule Change or an Irregular Operation.

6) UA has the right to refuse to accept Baggage from the Passenger if the Passenger fails to present the Baggage within the Check-in time limits specified in Rules 5 D) and E), or if the Passenger will be voluntarily separated from his or her Baggage (other than those Passengers whose flight is oversold and who volunteer to take a later flight). UA may require a signed release of liability as a condition of Baggage acceptance in these circumstances.

7) It is the Passenger's responsibility to attach proper identification to Baggage, and UA is not liable for a Passenger's failure to do so. It is also the Passenger's responsibility to claim the checked baggage at the baggage claim area, and UA assumes no obligation to verify the identity of the bearer at the destination airport.

8) Checked Baggage will generally be carried on the same aircraft as the Passenger unless such carriage is deemed impractical by UA, in which event the carrier will make arrangements to transport the Baggage on the next flight on which space is available. UA will charge fees to a Passenger for the delivery of Baggage when the Passenger fails to check-in within the applicable check-in time and it results in his/her Baggage traveling on a different flight.

9) All baggage is subject to inspection by UA and/or the TSA. However, there is no obligation that UA perform an inspection. UA will refuse to transport or will remove at any point baggage that the passenger refuses to submit for inspection.

10) UA will not accept baggage or other personal property for storage.

B) Baggage Allowance - When a Passenger presents a valid Ticket for transportation between points on UA, transportation of the Passenger's Baggage between such points will be subject to the terms and conditions of this Rule, as well as the Additional Liability Limitations found in Rule 28. For purposes of this Rule, "Baggage Allowance" is defined as the number of pieces of Baggage that will be carried subject to payment of applicable service charge(s), either as Checked Baggage or Carry-on Baggage, provided such Baggage meets the specified Maximum Outside Linear Dimensions and maximum weight of each piece.

1) Checked Baggage Allowance - UA will accept up to two pieces of Checked Baggage weighing 50.0 pounds/23.0 kilograms or less and a Maximum Outside Linear Dimension of 62 inches (158cm) (measured by adding the width + length + height) subject to payment of the applicable service charge(s). First and second Checked Baggage service charges, available on UA's Baggage Calculator, vary depending on the type of fare purchased, date of purchase, date of travel, active military status, the Passenger's itinerary (e.g., domestic or international), and/or when and where baggage is checked and the applicable service charge is paid (e.g., checked and pre-paid at united.com or at the airport). In addition, the following provisions apply for Checked Baggage:

a) UA may, at its sole discretion, change, consider and make exceptions to its Baggage Allowance policy (e.g., to the number, size, weight, type, and/or applicable service charges) for certain MileagePlus members, First Class and Business customers, certain credit card holders, active military personnel, and/or other Passengers depending on the fare class purchased.

b) Applicable Baggage service charges(s) paid are non-refundable. A Passenger who does not travel as a result of a cancellation, Schedule Change, or Irregular Operations will be eligible for a refund. See Rule 27 C). United will also reimburse Passengers for any fee charged to transport bag(s) that are lost.

c) UA may allow certain sporting equipment and other items to be checked in lieu of one piece of Baggage. See Rule 23 E) for more information.

d) Boxes weighing 50.0 pounds/23.0 kilograms or less and 42 linear inches (107 cm) may be accepted as Checked Baggage on flights operating as United Express to the Caribbean, Central America, and Mexico.

e) For travel to, from or within Micronesia, Baggage is limited to two checked bags, 1 checked bag and 1 checked box or 1 checked bag and 1 checked cooler not to exceed Maximum Outside Linear Dimensions of 62 linear inches (158 cm) and weighing 50.0 pounds/23.0 kilograms or less.

f) If bags exceed the maximum linear dimensions, weight, or allowance, excess baggage charges may also apply. Baggage weighing 100 pounds (45 kg) or more will not be accepted as checked baggage.

g) The items listed below will not be included as part of the Checked Baggage Policy, and can be checked free of charge:

(i) Assistive devices (e.g. cane, one set of crutches, one set of braces, prosthetic devices, or a wheelchair). For additional information on wheelchairs, see G) 4) below.

(ii) For flights departing from Hawaii, one box of pre-packaged fruit up to a maximum weight of 30 pounds.

(iii)    For each accompanied child, one child/infant's car restraint seat and one of the following items: a collapsible stroller, a compact folding stroller, *or* a folding wagon.

2)   Carry-on Free Baggage Allowance - UA will accept one piece of Carry-on Baggage free of charge, which, for purposes of this Rule, is referred to as the "Carry-on Free Baggage Allowance", and one personal item such as a shoulder bag, backpack, briefcase, laptop bag or similar item, except, however, UA will not accept any Carry-on Baggage for passengers traveling on a Basic Economy fare and Basic Economy passengers whose baggage is checked at the gate will be charged the applicable checked bag service charge, plus a 25 USD/25 CAD gate handling service charge.  Carry-on Baggage must not exceed the Maximum Outside Linear Dimensions of 9 inches (22 cm) x 14 inches (35 cm) x 22 inches (56 cm), which includes its wheels and handles. Personal items must not exceed 9 inches (22 cm) x 10 inches (25 cm) x 17 inches (43 cm), which includes any wheels and handles. A personal item that exceeds these maximum linear dimensions but is not greater than 9 inches (22 cm) x 14 inches (35 cm) x 22 inches (56 cm) will be considered as Carry-on Baggage. Carry-on Baggage or personal items suspected of being oversized may require being placed into a sizing unit to determine acceptability. Carry-on Baggage that exceeds the Maximum Linear Dimensions allowed or that exceeds the Carry-on Free Baggage Allowance will be considered as Checked Baggage and is subject to Checked Baggage service charges. For flights departing Yap, Federated States of Micronesia (YAP), the maximum weight of carry-on baggage is 25 lbs/11.3 kg; any bag heavier than this amount will be considered as Checked Baggage and is subject to Checked Baggage service charges, such as Excess and Oversize/Overweight Baggage charges. Carry-on Baggage may be stored in carry-on compartments of the aircraft if so equipped, or it must be retained in the Passenger's custody and stored under a seat or in an overhead compartment approved for the carriage of such Baggage. See Rule 23 F) 5) below for UA's Carry-on policy regarding musical instruments. Carry-on Baggage is subject to the following additional conditions:

a)   Operations, space constraints, security directives and/or other safety considerations may require limitations to the allowable Carry-on Baggage on a specific flight.

b)   UA reserves the right in its sole and absolute discretion to determine the suitability and place of storage of any items to be carried in the cabin of the aircraft.

c)   UA reserves the right to check a Passenger's Carry-on Baggage for any reason, including if the Carry-on Baggage cannot be safely stowed, or the Carry-on Baggage is compliant with the Maximum Outside Linear Dimensions specified in section 2) above.

d)   In addition to the Carry-on Free Baggage Allowance listed above, the following items do not count toward the one Carry-on plus one personal item:

    (i)   An overcoat or wrap.

    (ii)   An umbrella.

    (iii)   A reasonable amount of reading material.

    (iv)   A pet carrier (charges apply) (the carrier must be small enough to fit underneath the seat without blocking any person's path to the main aisle of the aircraft, and it must be stowed properly before the forward customer entry door to the aircraft is closed).

    (v)   A collapsible wheelchair.

    (vi)   A government approved child/infant restraint seat meeting Federal Motor Vehicle and FAA Approval Standards.

    (vii)   A camera.

    (viii)A diaper bag.

    (ix)   A breast pump.

    (x)   A limited amount of Airport Duty Free items, merchandise purchased in the airport, or food.  These items must be stowed in the same manner as Carry-on Baggage.

    (xi)   Assistive devices (a cane, one set of crutches, prescription medications and any medical devices needed to administer the medications, a Portable Oxygen Concentrator (POC), etc.).  These items must be stowed in the same manner as Carry-on Baggage.

    (xii)   A compact folding stroller that complies with the Carry-on Baggage restrictions above.

3)   Baggage Allowance for Children:

a)   Children paying for a seat will receive the appropriate baggage allowance for that seat in addition to one stroller or folding wagon and one car seat;

b)   Lap children will be granted a Baggage Allowance of one stroller or folding wagon and one car seat. Infants traveling internationally on 10% of an Adult fare are also allowed one stroller or folding wagon and one car seat in addition to their standard Baggage Allowance.

4) Passenger Reroutes - A Passenger rerouted in accordance with Rule 24 will be entitled to the maximum Baggage Allowance applicable for the trip originally purchased, regardless of whether the Passenger is transferred to a different class of service or whether the Passenger is entitled to a fare refund.

C) Excess and Oversize/Overweight Baggage Limits and Charges

1) Except as otherwise provided in the terms of this Contract of Carriage or by law, articles transported as Checked Baggage may not exceed the Maximum Outside Linear Dimensions of 115 linear inches (292 cm) or a maximum weight of 99.9 pounds (45.3 kg).

2) UA may, in its sole discretion, change, consider or make exceptions to its Excess or Oversize/Overweight Baggage policy (e.g., to the number, size, weight, type and/or applicable service charges).

3) Charges apply for Excess and Oversize/Overweight Baggage, in addition to applicable Baggage service charges(s) required to be paid pursuant to UA's general Baggage Allowance policy.  These charges apply each way (i.e., based on a one-way trip) and are cumulative (i.e., Baggage that is excess and also oversized and/or overweight will be subject to both Excess Baggage *and* Oversize/Overweight Baggage charges).

4) Excess and Oversize/Overweight Baggage charges, available on UA's Baggage Calculator, may vary depending on the type of fare purchased, date of purchase, date of travel, active military status, the Passenger's itinerary (e.g., domestic or international), and/or when and where Baggage is checked and the applicable service charge is paid (e.g., checked and pre-paid at united.com or at the airport).

5) UA's acceptance of Excess and Oversize/Overweight Baggage shall be on a space-available basis only, and shall be subject to the load capacities of the aircraft in use. United may prohibit Checked Baggage exceeding either 70 lbs or more than 115 linear inches.

6) Excess and/or Oversize/Overweight Baggage charges will apply from the point at which Baggage is accepted for transportation to the point at which Baggage is checked or transported in the Passenger compartment.  Baggage connecting to other airlines also may be subject to the connecting airline's Excess and/or Oversize/Overweight Baggage charges, in addition to UA's Excess and/or Oversize/ Overweight Baggage charges.

7) Excess Baggage Embargos – Excess and Oversize/Overweight Baggage may not be accepted on flights to/from certain destinations or during certain specified dates (usually holiday periods).  Contact United's Customer Contact Center for a list of cities and effective dates.

8) Declaration of Higher Value for Checked Baggage

   a) Passengers are not permitted to declare a higher value for Checked Baggage on UA or carriers doing business as United Express. When personal property, including Baggage, is tendered for transportation via two or more carriers other than UA with different maximum limits on declared value, the lowest limit for any such carrier shall apply to all carriers participating in such transportation.

D) Cabin Baggage Requiring a Seat - When a Passenger requests that an item be carried in the Passenger cabin of the aircraft as Cabin Baggage, and it is determined by UA in its sole and absolute discretion that the item is acceptable in the cabin but is so fragile and/or bulky as to require the use of a seat, the items will be accepted and considered Cabin Baggage. Examples include, but are not limited to, large or valuable musical instruments, media cameras, artifacts, garment bags, and similar items of a delicate nature or unusual size. In addition to the Carry-on Baggage conditions specified in Section B 2) a) and b) above, the following provisions also apply to Cabin Baggage Requiring a Seat:

1) Ticketed items are subject to thorough inspection.

2) Such items must be able to withstand the rigors of flight and should be packaged or covered, as necessary, to prevent contents from escaping and to avoid possible injury to other passengers. It is prohibited for either the instrument or the case to contain any object not otherwise permitted to be carried in an aircraft cabin because of the rules contained in this Contract, or any applicable law, regulation, rule, and/or security directive.

3) Ticketed items must be carried aboard the aircraft and strapped in a seat adjacent to the owner using the seatbelt securely (eliminating the possibility of shifting).

4) The weight of the item (including any case or covering) is not to impose any load on these seats or floor structure that exceeds the load limitations for these components, and cannot exceed 165 pounds, or the applicable weight restrictions for the aircraft.

5) No article secured to a seat may obstruct access to, or use of, any emergency or regular exit; block or protrude into any aisle or exit path; or obstruct any passenger's view of the overhead fasten seatbelt and no smoking signs or any required exit sign or video monitor/screens.

   NOTE: Due to the cabin configuration and FAA regulations, Cabin Baggage locations may vary.

6) No article may be secured in an emergency exit seat.

7) A seat for ticketed Cabin Baggage must be reserved in advance and the applicable charges must be paid.

8) UA will charge 100 percent of the applicable Adult fare for the portion of the trip on which the extra seat is used. The Cabin Baggage will not be included in determining Baggage Allowance or Excess Baggage Charges.

NOTE: Cabin-Seat baggage may not be accepted on some aircraft with weight/size restrictions.
NOTE: UA personnel, including flight attendants and other crew members, cannot assist with the movement or placement of Cabin Baggage Requiring a Seat.

E)  Sports Equipment/Special Items – The sports items listed below, and which must weigh less than 50.0 pounds (23.0 kg) and a maximum outside linear dimension of 62 inches (158cm), will be accepted as Baggage by UA in accordance with the following provisions, accepted at applicable first and second checked bag service charges, and/or special item handling charges specified below.  Charges are based on a one-way trip and are applicable from the point at which the item is accepted to the point to which the item is transported. Where an item is not included in the Baggage Allowance, and not specified as a special item listed below, it will be treated as excess baggage (first bag service charge, second bag service charge or excess bag service charge may apply, as well as applicable oversize and overweight service charges). Special item fees are based on a per item basis. Except for certain International Carriage subject to the terms of the Montreal Convention, UA is not liable for damage to the Sports Equipment/Special Items specified below when carried as Checked Baggage.
NOTE: Flights operating as United Express do not accept certain items listed below.

1)  Archery Equipment - One item of archery equipment (a bow case containing bows, a quiver with arrows, or a maintenance kit of sufficient strength to protect items from damage) will be considered as one item of sporting equipment and allowed in place of one checked bag. United is not liable for damage to archery equipment that is not contained in a hard-sided case.

2)  Baseball Equipment – One bag of baseball equipment will be considered as one item of sporting equipment and will be allowed in place of one checked bag. Baseball bats are not permitted in carry-on baggage.

3)  Bicycles - United accepts non-motorized bicycles with single or double seats (including tandem) or up to two non-motorized bicycles packed in one case as checked baggage. If the bicycle(s) are packed in a container that is over 50.0 pounds/23.0 kilograms, it will be subject to standard overweight charges and first and second bag fees may also apply. If the bicycle(s) are packed in a container that is 50.0 pounds/23.0 kilograms or less, if applicable, the first or second bag service charge applies. Handlebars must be turned sideways and protruding pedals and accessories must be removed, or all loose items must be enclosed in plastic foam or similar protective material, or the bicycle must be enclosed in a sealed box.  United is not liable for damage to bicycles that do not have the handlebars fixed sideways and pedals removed, handlebars and pedals encased in plastic foam or similar material, or bicycles not contained in a cardboard containers or hard-sided cases. If your itinerary includes a United Express flight, please contact United for information regarding aircraft cargo hold. Bicycles will not be accepted during excess baggage embargos.

4)  Boogie/Skim/Speed Boards - One boogie/skim/speed board or one boogie/skim/speed board bag containing up to two boards will be considered as one item of sporting equipment and allowed in place of one checked bag.

5)  Bowling Equipment - One set of bowling equipment consisting of a bowling bag (up to three in one bag), one to three bowling balls, and one pair of shoes will be considered as one item of sporting equipment and allowed in place of one checked bag. Bowling equipment weighing more than 50.0 pounds (23.0 kg) will be subject to overweight baggage charges.

6)  Camping Equipment – Tents, backpacks or knapsacks, and sleeping bags will be accepted as checked baggage. Certain items made of cloth, plastic, vinyl or other easily torn material and those having aluminum frames, outside pockets, straps, buckles and other protruding parts will be accepted as fragile items. UA shall not be liable for fragile items. Lanterns, stoves and heating equipment which use liquid fuel, propane, butane or similar will not be accepted as checked or carry-on baggage in accordance with DOT hazardous materials regulations.

7)  Fencing Equipment – One suitable container or packaging securely encasing fencing equipment will be considered as one item of sporting equipment and allowed in place of one checked bag.  EXCEPTION:  Fencing containers that do not contain only fencing equipment will be subject to Overweight/Oversize Excess Baggage Charges.

8)  Firearms/Shooting Equipment/Stun Guns – One item of shooting equipment per Passenger will be considered as one checked bag only when permitted by governmental regulations, and subject to the conditions below including UA's firearm policy. One item of shooting equipment is defined as: One hard-sided shooting equipment case containing up to five firearms, with or without scopes, and 11 pounds (five kgs.) of ammunition. Firearms carried in addition to this allowance will be assessed at the current excess baggage charge.

   a)  International firearm regulations and laws vary by destination and transiting country. Contact appropriate consulates or embassies to obtain specific entry requirements applicable to destination(s). UA is not liable for any assistance or information provided by any employee or agent of UA to any Passenger relating to such regulations or compliance with such laws, or for the consequences to any Passenger resulting from his/her failure to comply with such regulations or laws.

   b)  A Firearm will be accepted only from a customer who is 18 years of age or older.

   c)  Curbside check-in of a firearm is not permitted.

   d)  Advanced arrangements must be made.

25

e) The firearm, including a hand gun, must be packed in a hard-sided container with a lock. The container must be locked at the time of acceptance by UA and the key or combination must remain in the customer's possession. The locked hard-sided container holding a handgun may be placed inside an unlocked soft-side piece of luggage. Containers may be purchased from UA. United is not liable for damage to a firearm or a hand gun that is not contained in a hard-sided case. EXCEPTION:  For travel to/from the United Kingdom, handguns, pistols, rifles, and shotguns must be packed in a hard side rifle case.

f) Baggage containing firearms will not be accepted knowingly for transportation by UA at any point unless a declaration, signed by the Passenger presenting such Baggage and dated on the day the Baggage is accepted for transportation, is attached to the inside of the case declaring that the firearm is not loaded.

g) Properly packaged small arms ammunition up to a maximum of 11 pounds (five kgs.) may be checked as Baggage.  The ammunition may be packed in the same container as the firearm or in a separate container. Ammunition must be packed in the manufacturer's original package or securely packed in fiber, wood or metal containers and the ammunition inside the container must be protected against shock and secured against movement.  The Passenger shall make a written declaration confirming that the above provisions are met. Ammunition with explosive or incendiary projectiles will not be accepted.

h) Except for military missions (e.g., CRAF), at no time will fully automatic weapons be acceptable as Checked or Carry-on Baggage.

i) When a firearm that is used for sporting purposes is carried on the aircraft, the Passenger must have entry permits for the country/countries of transit and Destination. UA is not liable for any assistance or information provided by any employee or agent of UA to any Passenger relating to such entry permits, or for the consequences to any Passenger resulting from his/her failure to obtain such entry permits.

    (i) EXCEPTION:  This provision may not apply to authorized persons who are performing a duty on board an aircraft, such as a law enforcement officer or diplomatic courier.  Such Passenger may be permitted to retain custody of a firearm and ammunition upon identification at the time of check-in. The firearm will be transported in a section of the aircraft that is inaccessible to the customer.

j) Stun Guns- Stun guns with their dry cell batteries removed are accepted in checked baggage only and solely for domestic travel, and when permitted by local, state, and/or governmental laws and regulations, which vary by destination. UA is not liable for any assistance or information provided by any employee or agent of UA to any Passenger relating to such regulations or compliance with such laws, or for the consequences to any Passenger resulting from his/her failure to comply with such laws or regulations. Tasers are prohibited as either carry-on or checked baggage.

UA, at any time, without notice and for any reason, can suspend the carriage of firearms, shooting equipment, and stun guns.

9) Fishing Equipment - Two rods, one reel, one landing net, one pair of fishing boots and one fishing tackle box (all properly encased) will be considered as one item of sporting equipment and allowed in place of one checked bag. The total of all fishing equipment must weigh 50.0 pounds/23.0 kilograms or less, or overweight charges may apply. Fishing equipment containers must not exceed 115 linear inches or oversized charges may apply. For United Express flights, fishing equipment exceeding 80 linear inches will not be accepted as checked baggage.

10) Golfing Equipment – One standard-sized golf bag containing golf related equipment and personal items will be permitted and accepted as Checked Baggage, subject to the limits set forth in Rule 23(B)(1). Applicable overweight charges based on a customer's baggage allowance will apply. All contents must be properly encased in a suitable container. The golf bag must be covered or enclosed in a heavy, rigid carrying case. UA assumes no liability for damages to items contained in a soft-sided case.

11) Gymnastic Equipment –One item of gymnastic equipment or one suitable container or packaging that securely contains gymnastic equipment will be considered as one item of sporting equipment and allowed in place of one checked bag. EXCEPTION: Gymnastic cases weighing over 50.0 pounds (23.0 kg) that do not contain only gymnastic equipment will be subject to Overweight/Oversize Excess Baggage Charges.

12) Hang Gliding Equipment - Subject to the conditions and charges specified below, individual components of hang-gliding equipment can generally be packed in separate bags for each component. United will accept a maximum of two items per bag for a set of four component bags. Hang gliding equipment must not exceed 99.9 pounds (45.4 kg), and maximum length allowed varies by aircraft type.

a) United will accept hang gliding equipment as checked baggage up to the customer's maximum Checked Baggage Allowance. First, second, and any applicable oversize and overweight bag fees may apply.

b) Hang gliding equipment is not accepted as checked baggage on United Express flights, and is not accepted during excess baggage embargoes.

c) Allow an extra 30 minutes at check-in.

13) Hockey/Lacrosse Sticks/Curling Brooms or Brushes – Up to two hockey, curling brooms/brushes, or lacrosse sticks taped together plus one hockey, curling, or lacrosse bag will be considered as one item of sporting equipment and

allowed in place of one checked bag. A duffel bag containing hockey, lacrosse, or curling equipment is treated as a normal checked bag. A duffel bag containing hockey equipment is subject to applicable overweight and oversize excess baggage charges. Hockey, curling brooms/brushes, or lacrosse sticks carried in addition to the free baggage allowance will be assessed at current excess baggage charges.

14) Javelins – One hard sided container encasing javelins that are taped together will be considered as one item of sporting equipment, if aircraft size and load conditions permit, and allowed in place of one checked bag. Javelins carried in addition to the free baggage allowance will be assessed at current excess baggage charges.

15) Kiteboards - Subject to the conditions and charges specified below, United will accept one kiteboard or one bag containing kite board equipment as checked baggage. The board must be well padded or the entire board must be encased in a suitable container to avoid scratching.

   a)   United will accept kiteboards as checked baggage up to the customer's maximum Checked Baggage Allowance. First, second, and any applicable oversize and overweight bag fees may apply.

   b)   Kiteboards greater than 115 linear inches (292 cm) will not be accepted as checked baggage. Kite boards greater than 80 linear inches (203 cm) will not be accepted as checked baggage on United Express flights. Kiteboards are not allowed during excess baggage embargos (except to Costa Rica).

   c)   Allow an extra 30 minutes at check-in.

16) Oars - One pair of oars or one oar case containing up to two oars will be considered as one item of sporting equipment, if aircraft size and load conditions permit, and allowed in place of one checked item. Oars carried in addition to the free baggage allowance will be assessed at current excess baggage charges.

17) Paintball Equipment - One bag containing equipment used in the paintball sport will be considered as one item of sporting equipment, if aircraft size and load conditions permit, and allowed in place of one checked item. Paintball guns are not permitted as carry-on baggage. A paintball gun may be checked in an unlocked soft or hard sided case. Paintball ammunition must be packed in the manufacturer's original package or securely packed in a container that will protect the paint balls from breakage. Compressed gas cylinders must be empty and have the regulator removed to allow for a visual inspection by a TSA Security Screener. Unopened paintball air canisters in original plastic packaging are sold empty and Passengers do not need to demonstrate that the canisters are empty.

18) Parachutes/Parasails - A sports parachute or parasail will be considered as one items of sporting equipment and allowed in place of one checked item. A parachute or parasail taken onboard the aircraft must meet carry-on size restrictions for placement underneath an aircraft seat. When checked as baggage, all excess, oversize and overweight charges will apply.

19) Pool cues –One pool cue case containing pool cues will be accepted as Checked Baggage.

20) Scuba/Diving Equipment – One suitable dive bag securely containing scuba/diving equipment will be considered as one item of sporting equipment and allowed in place of one checked bag. Dive bags weighing more than 50.0 pounds and/or that are over 62 linear inches will be charged as sporting equipment and special item charges apply. An empty dive tank or up to 3 rebreather tanks will not be included in determining the free baggage allowance and will be subject to a 150 USD/150 CAD service charge (each way) for flights within the U.S., Canada, Puerto Rico and the U.S. Virgin Islands. A 200 USD service charge (each way) applies for all other travel.

   NOTE: The empty dive/rebreather tank must have the regulator valve completely disconnected from the tank. The tank must not be sealed (i.e. the tank has an open end). The tank must have an opening to allow for a visual inspection by a TSA Security Screener. For rebreather equipment, soda lime that is 4% Sodium Hydroxide or less will be accepted in checked baggage. Soda lime that is 4.1% Sodium Hydroxide will not be accepted in checked baggage.

21) Skating Equipment – One pair of ice skates, roller skates, and rollerblades will be considered as one item of sporting equipment and allowed in place of one checked bag. For Domestic Carriage only, ice skates are permitted in carry-on baggage. Skating equipment carried in addition to the baggage allowance will be assessed at the current excess baggage charge. Skating equipment is subject to applicable overweight and oversize excess baggage charges.

22) Surfboards – Subject to the conditions and charges specified below, one surfboard or one surfboard bag containing up to four boards per customer with a maximum weight of 50.0 pounds/23.0 kilograms and maximum length of 115 linear inches (293 cm) will be accepted as Checked Baggage. Oversize fees will apply for any surfboard that is greater than 62 (158 cm) linear inches. The skeg/fin must be removed or well padded. The entire board must be encased in a suitable container to avoid scratching.

   a)   United will accept surfboards as checked baggage up to the customer's maximum Checked Baggage Allowance. First, second, and any applicable oversize and overweight bag fees may apply.

   b)   Surfboards or surfboard bags more than 115 linear inches (292 cm) will not be accepted as checked baggage. On United Express flights, surfboards or surfboard bags more than 80 linear inches (203 cm) will not be accepted as checked baggage, and will not be accepted during baggage embargos (except for Costa Rica). If your itinerary includes United Express, please contact United for information regarding aircraft cargo hold limits.

27

  c) Allow an extra 30 minutes at check-in.

23) Tennis Equipment – One tennis racket case containing tennis rackets and balls will be considered as one item of sporting equipment and allowed in place of one checked bag. Tennis equipment must be properly protected or a limited liability form must be signed.

24) Water Skiing/Snow Skiing/Snowboard Equipment/Wakeboards

  a) One item of ski equipment (one pair of water skis, one snowboard, one wakeboard, up to two pairs of snow skis and associated equipment in one snowboard bag, or one ski boot) with a weight of 50.0 pounds/23.0 kilograms or less is allowed in place of one checked bag.  If more than one set of ski equipment is checked, each additional set of equipment (as outlined above) will be counted as one item, and the associated service charge(s) will apply. Acceptance is subject to aircraft size and load conditions.

  b) Ski Bags and ski boot bags weighing more than 50.0 pounds (23.0 kg) that contain other items in addition to or in place of appropriate snow or water skiing equipment or ski boots will be subject to Overweight/Oversize Excess Baggage Charges.

25) Wave Ski - Subject to the conditions and charges specified below, one wave ski or one bag containing equipment used in wave skiing with a weight of 50.0 pounds/23.0 kilograms or less and a maximum length of 115 linear inches (293 cm) will be accepted as Checked Baggage. Oversize fees will apply for any wave ski that is greater than 62 (158 cm) linear inches. The board must well-padded or the entire board must be encased in a suitable container to avoid scratching.

  a) United will accept wave skis as checked baggage up to the customer's maximum Checked Baggage Allowance. First, second, and any applicable oversize and overweight bag fees may apply.

  b) Wave skis greater than 115 linear inches (292 cm) will not be accepted as checked baggage. On United Express flights, wave skis greater than 80 linear inches (203 cm) will not be accepted as checked baggage.  Wave skis will be transported subject to load capacities of the aircraft on any itinerary involving a United Express flight. Wave skis will not be accepted during excess baggage embargos.

26) Windsurfing Equipment- Subject to the conditions and charges specified below, windsurfing boards will be accepted as Checked Baggage.  For purposes of this provision, one windsurfing board not exceeding 115 linear inches and not exceeding 99.9 pounds (45.3 kg) with one boom, one mast, one sail and necessary hardware will be considered as one item of windsurfing equipment.

  a) Windsurfing equipment must be padded and enclosed in suitable packing sufficient to protect from scratches or dents or other damage.

  b) United will accept windsurfing equipment as checked baggage up to the customer's maximum Checked Baggage Allowance. First, second, and any applicable oversize and overweight bag fees may apply.

  c) Windsurfing equipment cannot be accommodated on any itinerary involving a United Express flight, and is not accepted during excess baggage embargos. Additional size or acceptance limitations may apply dependent upon aircraft type and configuration.

  d) Allow an extra 30 minutes at check-in.

F) Fragile and Perishable Items –Fragile and perishable items include, but are not limited to, examples in Limitation of Liability, Rule 28 K). Upon request and subject to operational needs or space availability, a fragile or perishable item may be carried in a seat subject to the provisions and applicable charges in D) above. A fragile or perishable item may be accepted as Checked Baggage in accordance with this Rule only if it is packaged appropriately (*e.g.*, in an original, factory-sealed carton, in a cardboard mailing tube, in a container/case designed for shipping such item or packed with protective internal material). Except for certain International Carriage subject to the terms of the Montreal Convention, UA is not liable for loss or damage of contents or delay in delivery which result from the unsuitability of such item(s) as Checked Baggage and/or the inadequacy of its packaging and not from the carrier's failure to exercise the ordinary standard of care. UA is not liable for damage to a customer's Carry-on Baggage or other in-cabin property that contains fragile or perishable items when such damage is caused by the fragile or perishable items.  Customers are responsible for all damage caused by their property, whether such damage is to their own property or to someone else's property.

1) Antlers - Subject to the conditions and charges specified below, one set of antlers retained as hunting trophies per ticketed Passenger will be accepted as Checked Baggage, if aircraft size and load conditions permit.

  a) Antlers will not be included in determining the Baggage Allowance and will be subject to a service charge of 150 USD/150 CAD per item. For international travel, a 200 USD/200 CAD per item service charge applies.

  b) Antlers must be as free of residue as possible.

  c) The skull must be wrapped and tips protected.

  d) Maximum Outside Linear Dimensions must not exceed 120 inches. However, on United Express Canadair regional jet flights the linear dimensions of the antlers cannot exceed 33 in. x 43 in. (83 cm x 109 cm) and overall linear dimensions must not exceed 98 in. (248 cm).

e)  The Passenger must make all arrangements and assume full responsibility for complying with any applicable laws, customs, and/or other governmental regulations, requirements, or restrictions of the county, state or territory to and from which the antlers are being transported.

2)  Dry Ice and Other Restricted and Prohibited Articles

a)  Any articles deemed a hazardous material pursuant to DOT Hazardous Materials Regulations (49 CFR 171-177), the IATA Dangerous Goods Regulations and revisions and reissues thereof (hereinafter the "Haz-Mat Regulations") will only be accepted subject to advance arrangements and compliance with the Haz-Mat Regulations. (NOTE: Any obligations of UA which may arise under this Rule or Rule 28 are not applicable when undeclared articles deemed hazardous material are discovered in checked baggage and confiscated and/or destroyed.)

b)  Limited quantities of dry ice, a maximum of 5.5 pounds (2.5 kilograms) per Passenger, will be accepted for carriage as checked or Carry-on Baggage provided the Baggage is properly designed to permit the release of carbon dioxide, and the container is labeled, "DRY ICE" or "CARBON DIOXIDE SOLID." The packaging must also show the net weight and identify the perishable item being preserved by the dry ice. Each container cannot have more than the maximum allowed per customer. Multiple Passengers cannot pool their portions together, even within the same traveling party.

c)  A 150 USD/150 CAD service charge applies to the transportation of dry ice as checked baggage on flights within or between the U.S. and Canada, and a 200 USD service charge applies to the transportation of dry ice as checked baggage on flights to all other destinations.

d)  UA may require acceptance of such articles at locations other than the passenger terminal.

e)  E-Cigarettes or Personal Vaporizers will not be accepted in Checked Baggage.

f)  Hoverboards, smart wheels, and any other self-balancing or self-propelled luggage, vehicles or devices are not accepted as checked or carry-on baggage.

g)  Lithium batteries, power banks, and spare batteries are not accepted as checked baggage. These types of batteries must be removed from any checked or carry-on baggage, including baggage checked at the gate. All batteries integrated as a part of the bag themselves (sometimes referred to a smart bags) must also be removed if checked or brought on as carry-on baggage. Any items with non-removeable lithium batteries are not allowed on any United or United Express flights. Cell phones and computers installed with a lithium battery of less than 100 watt hours are permitted in carry-on and checked baggage.

h)  The following items are prohibited as checked and carry-on baggage: Avalanche packs; fuel; mace and other self-defense sprays; fireworks, gunpowder, flares, flare guns and holiday poppers; gasoline-powered equipment; bleach, drain cleaners, epoxy, fuel, gel fuel, glue, insecticides, paint, torch lighters, spray starch, strike-anywhere matches and certain aerosols; ready-to-eat meals (MREs); and shock absorbers.

i)  Any items prohibited by the TSA.

j)  Illegal drugs, marijuana, and any cannabis infused products, such as Cannabidiol (CBD) oil are prohibited in Checked or carry-on Baggage.

k)  Commercial products are prohibited in Checked or carry-on Baggage. Such prohibited commercial products include: Automotive parts; major appliances (e.g., refrigerators, dish washers, washing machines, dryers, and televisions); bulk quantities of clothing; bulk quantities of food; and anything else determined to be a commercial product in UA's sole discretion. Commercial products may be carried as airfreight only and subject to applicable freight rates and availability.

3)  Liquor - Subject to the conditions below, alcoholic beverages in retail packaging may be checked as baggage.

a)  For alcoholic beverages less than 24 percent alcohol by volume (including most wines and beers) there are no restrictions on the amount that may be accepted in checked baggage or purchased after completing security screening at the checkpoint (Duty Free). If traveling internationally, alcoholic beverages may be subject to customs limits in the arrival country.

b)  For alcoholic beverages between 24 and 70 percent alcohol by volume there is a limit of 5 liters (1.3 gallons) per customer that may be accepted in checked baggage, or that may be purchased after completing security screening at the checkpoint (Duty Free). Packaging must be in receptacles smaller than 5 liters. Alcoholic beverages more than 70 percent alcohol by volume will not be accepted.

c)  All alcoholic beverages must be packed to prevent leakage and damage to other bags. UA shall not be liable for breakage or spillage of alcoholic beverages. Normal checked baggage allowance limits, excess charges and carry-on limits apply.

d)  Up to 3 oz. (100ml) of an alcoholic beverage may be taken through the security checkpoint provided it is less than 70 percent alcohol by volume, in a container that is 3 oz. or smaller, and is carried in a plastic zip-top bag.

e)  Alcohol transported on an airplane cannot be consumed on board

29

4) Musical Instruments - Musical instruments may be carried as Checked Baggage or as Cabin Baggage subject to the provisions in D) above. As part of a Passenger's one carry-on plus one personal item allowance and subject to UA's Carry-on Baggage conditions specified in Section B 2) a) and b) above, a small musical instrument such as a violin or a guitar can be carried in lieu of a carry-on bag if the instrument can be stowed safely in an overhead bin or under the Passenger's seat and there is space for its stowage at the time the Passenger boards. If the musical instrument appears too large or irregularly shaped to fit under the seat or in the overhead compartment, or, if at the time the customer boards the aircraft, there is no space to stow it, it will not be accepted for in cabin stowage and will be checked to the Passenger's final destination and subject to the applicable checked-baggage and gate-checked handling charges. In the case of Basic Economy passengers, a small musical instrument may be carried on in addition to a personal item if it can be stowed safely in an overhead bin or under the Passenger's seat and there is space for its stowage at the time the Passenger boards. A larger musical instrument brought to the gate as a carry-on by a Basic Economy passenger and any instrument that cannot fit under the Passenger's seat or in open overhead bin space available at the time the Basic Economy passenger boards will be checked to the Passenger's final destination and subject to the applicable checked-baggage and gate-checked handling charges. All musical instruments, whether carry-on or checked, should be in a hard sided case, and stringed instruments should have the strings loosened to protect the neck from damage due to expansion and contraction which result from temperature variations. Checked instruments cannot exceed 165 pounds and 150 linear inches (or the applicable weight/size restriction for the aircraft) and will be included in determining the Baggage Allowance, and when in excess (over 2 checked items), overweight or oversize (115 linear inches is considered oversized, and over 50.0 pounds (23.0 kg) is considered overweight), will be subject to the Excess, Oversize, and Overweight Baggage Charge. Except for certain International Carriage subject to the terms of the Montreal Convention, UA is not liable for damage to musical instruments or musical instrument cases.

5) Seafood - Seafood will be accepted and included in determining the Checked Baggage Allowance only if it is wrapped in a sealed protective material and packed in a leak-proof container. Seafood is subject to applicable excess, overweight and/or oversize charges. UA is not liable for seafood. Seafood will not be accepted if packed in wet ice or in a Styrofoam container.

6) UA will not accept wet ice or items containing wet ice as Checked or Carry-on Baggage.

7) UA will not accept perishable items packed in Styrofoam containers.

8) For travel to, from or within Micronesia, perishable items will only be accepted for transportation if within the Checked Baggage Allowance.

9) ZAM ZAM Water - Subject to the conditions below, one container or jerkin containing up to 10 liters (2.64 gallons) of ZAMZAM water will be accepted as checked baggage by UA at no extra charge in addition to the Baggage Allowance.

   a) Containers or Jerkins containing ZAMZAM water must be properly packed in a plastic covering to prevent leakage and damage to other bags. UA is not liable for breakage or spillage of ZAMZAM water and/or containers.

   b) ZAMZAM containers or jerkins are not permitted as Carry-on or Cabin Baggage.

   c) Jerkins or ZAMZAM water containers in excess of one will be subject to excess baggage charges.

G) Other Checked Baggage Items - The items listed below will be accepted as Baggage by UA in accordance with the following specified provisions.

   1) Government approved child/infant seat - A government approved child/infant seat that conforms to all applicable Federal Motor Vehicle standards and approved in accordance with US FAR 121.311, including car seats approved for airline travel, will be accepted in addition to a Passenger's baggage allowance. When checked as baggage, all oversize and overweight charges will apply. First and second bag charges do not apply. A government approved child/infant seat for use in the Passenger compartment is permitted only when an additional seat is reserved for the Infant, a Ticket is purchased, and the seat can be secured properly by a seat belt. The accompanying Adult Passenger is responsible for ensuring that the seat functions correctly, that the Infant does not exceed the seat's limitations, that the Infant is properly secured in the seat and that the seat is secured to the aircraft seat. UA is not liable for damage to child/infant seats when carried or brought onboard as anything other than Checked Baggage.

   2) U.S. Military Baggage Allowance - Active U.S. military and their accompanying dependents on personal travel are allowed three (3) bags up to 70 pounds each with a maximum dimension of 62 linear inches without excess or overweight charges being assessed. Active U.S. military personnel on orders and active U.S. military personnel and their dependents (whether accompanying or non-accompanying) on orders for relocation are allowed five (5) bags up to 100 pounds each in United Economy, United Business, United Polaris business class, United First and United Polaris first class with a maximum dimension of 115 linear inches without excess, overweight or oversize charges being assessed. Non-accompanying dependents on travel not related to an order for relocation are not entitled to this additional baggage allowance.

30

3) Strollers and Folding Wagons– United accepts one collapsible stroller, one compact folding stroller, *or* one folding wagon in addition to a Passenger's baggage allowance. One non-collapsible stroller may be carried as Checked Baggage in lieu of one piece of Baggage (62 inches Maximum Outside Linear Dimensions). This item will be included in determining the Baggage Allowance, and when in excess, overweight or oversize, such item will be subject to the Excess Baggage Charge. Except for certain International Carriage subject to the terms of the Montreal Convention, UA is not liable for damage to strollers or folding wagons when carried as Checked Baggage.

4) Wheelchairs – Up to two wheelchairs per Passenger will be accepted as Baggage by UA at no extra charge in addition to the Baggage Allowance. Excess and/or Oversize/Overweight baggage charges pursuant to Rule 23 C) may apply for checking in additional wheelchair(s) that are used for recreational purposes.

   a) In-cabin stowage of a wheelchair shall be in accordance with 14 CFR, Part 382, Subpart I.

   b) If no in-cabin storage space is available, the wheelchair will be carried in the cargo compartment of the aircraft.

   c) All types of wheelchairs will be accepted (collapsible, noncollapsible or powered wheelchairs with wet cell, dry cell or lithium batteries).

   d) For battery powered wheelchairs:

      (i) Passenger must check in at least one hour before the check-in time for the general public for Domestic U.S. flights and for International flights as set forth in Rules 5 D) and 5 E).

      (ii) The battery must be disconnected and/or wheelchairs with dry cell/lithium batteries must be secured to prevent accidental activation.

      (iii) Wheelchairs containing lithium ion batteries will be accepted as checked baggage provided the battery is securely attached to the wheelchair, and has a means to prevent unintentional activation or short circuiting.

      (iv) Lithium ion batteries for collapsible wheelchairs must be removed and carried in carry-on baggage only. A maximum of one spare battery not exceeding 300 WH or two spare batteries not exceeding 160 WH must be carried in carry-on baggage only.

H) Animals Other than Service Animals (For rules applicable to these animals, see Rule 16) - The transportation of live animals (other than Service Animals) in the cabin of the aircraft is subject to the provisions of this Rule. UA will accept domesticated cats and dogs for transportation as in-cabin Baggage for domestic carriage and travel between U.S.A./Canada and Mexico, the Caribbean, Central and South America. (Exception: In-cabin pets will not be accepted for travel to/from Australia, Barbados, Brazil, Cuba, Guam, French Polynesia, Guyana, Hawaii, Hong Kong, Iceland, Ireland, Jamaica, Marshall Islands, Federated States of Micronesia, New Zealand, Northern Mariana Islands, Norway, Palau, Philippines, Saint Kitts and Nevis, South Africa, Sweden, Trinidad and Tobago, United Arab Emirates, and United Kingdom). Certain unusual animals/reptiles pose unavoidable safety and/or public health concerns and UA will not accept dogs of certain breeds, Snakes, other reptiles, ferrets, lagomorphs (i.e., rabbits and hares), rodents and spiders as in-cabin baggage. Carriage of any other pets as in-cabin Baggage will be at UA's discretion.

   1) General Conditions of Acceptance

      a) Advance arrangements must be made. Space must be reserved for animals in the passenger cabin. Animals without reserved space will be accepted, if space is available, only after the animals for whom space has been reserved have been accommodated.

      b) The animal must be harmless, inoffensive, odorless and require no attention during transit.

      c) The animal must be confined in a cage or container subject to inspection and approval by UA before acceptance and must meet the department of agriculture requirements prior to acceptance.

      d) The container must be stored and remain under the seat directly in front of the Passenger at all times, and the animal must remain in the container at all times. The passenger will not be permitted in a row immediately behind a bulkhead, or adjacent to an emergency exit. In the event the animal becomes offensive or causes a disturbance during transit, the animal may be removed, at the Captain's discretion, at the first stop and placed on an alternative carrier at the Passenger's expense.

      e) The Passenger must make all arrangements and assumes full responsibility for complying with any applicable laws, customs, and/or other governmental regulations, requirements, or restrictions of the country, state or territory to and from which the animal is being transported, including furnishing valid health and rabies vaccination certificate when required. UA will not be liable for loss or expense due to the passenger's failure to comply with this provision, and UA will not be responsible if any pet is refused passage into or through any country, state, or territory.

      f) UA will accept no more than one in-cabin pet container per Ticketed Passenger. UA may refuse to accept any pet if, in its sole discretion, it is not properly or safely confined in a container approved by UA.

      g) There may be only one small cat or dog per container, and the animal must be able to stay comfortably, a determination made in UA's sole discretion, in the container under the seat for the entirety of the flight.

31

h) UA will not transport an animal as in-cabin Baggage if the animal is in the custody of an Unaccompanied Minor age five (5) to fourteen (14) years old.

i) The total number of Passengers carrying pet and the total number of in-cabin pets permitted on a single flight is limited by aircraft type and cabin.

j) UA reserves the right to refuse carriage of animals in cabin at any time.

NOTE: Animals will not be accepted for carriage on some United Express flights.

2) Pet Containers

a) Containers must be leak-proof and subject to inspection and approval by UA prior to acceptance. UA may refuse to accept any animal if, in its sole discretion, the animal is not properly confined in a container approved by UA.

b) Containers must be made of metal, wood, polyethylene, fiberglass or composite material of similar strength.

c) Containers must be ventilated on at least two sides and prevent any part of the animal from protruding outside of the container.

d) Containers made totally of wire are not accepted.

e) Approved soft side carriers specifically designed as pet carriers are acceptable.

f) In-cabin animal containers must not exceed 17.5 inches in length by 12 inches in width by 9 inches in height for hard sided containers and 18 inches in length by 11 inches in width by 11 inches in height for soft sided containers, except for on Boeing 737 MAX aircraft, where the maximum height for both a soft and a hard-sided carrier is 10 inches.

g) Containers in such condition as to allow possible escape by an animal will not be accepted for transportation.

h) Passengers are responsible for ensuring that the containers and their animals' travel meet all governmental requirements for the safe and humane transportation of the animal being transported, including, but not limited to being the correct size, and ensuring that the animal is small enough to stay comfortably in the container at all times under the Passenger's seat and for the entirety of the flight.

i) Containers for transporting dogs and cats may be purchased from UA.

3) Carriage of Animals - (including their containers) is subject to the applicable service charge of a 150 USD/ 150 CAD each way (300 USD/300 CAD for round-trip travel).

4) Abandonment of Animals - An animal that is unclaimed by its owner or its owner's agent for a period of more than three (3) days after the scheduled carriage has occurred or was to occur, shall be deemed abandoned and UA will make reasonable efforts to return the animal to the owner or the owner's agent designated for that purpose. If the owner or the owner's agent cannot (or refuses to) be located after a period of three days, then the animal may be turned over to a local animal shelter or pound or otherwise handled as UA may deem proper without any liability to UA. Any costs associated with: (1) returning the animal deemed abandoned to the owner or the owner's agent or (2) caring, feeding, or transporting the abandoned animal, among other things, shall be borne solely by the owner or owner's agent.

5) Limitation of Exclusion from Liability

a) UA will not be liable for illness or injury to an animal or death of an animal.

b) UA will not be liable for loss or expense due to the Passenger's failure to comply with the provisions of this Rule, including, without limitation, if any animal is refused passage into or through any state or country.

I) Interline Baggage Acceptance

1) Applicability-Rule 23 I) solely applies to interline itineraries on a Single Ticket whose origin or ultimate ticketed destination is in Canada. For definitional understanding of the terms used in this Rule, see Rule 1 for clarification.

2) Baggage Rules Determination

a) Checked Baggage: When UA is the Selecting Carrier it will select and apply its own checked baggage rules found in Rule 23 throughout the Passenger's Interline Itinerary. When a Passenger makes a voluntary change to his or her itinerary, the checked baggage rules of the new Selected Carrier apply. The Selected Carrier's checked baggage service charges apply at any point where bags are checked, including stopovers. See Rule 23 B) 1) above for UA's Baggage Rules concerning special status, Rule 23 C) 7) regarding embargoes that may affect interline travel, and Rules 23 D), E), F), G) and H) regarding the transportation of special items.

b) Carry-On Baggage: Each Operating Carrier's carry-on baggage allowances and policies will apply to each flight segment in an Interline Itinerary, other than carry-on baggage charges, which are governed by the Selected Carrier's baggage rules. See Rule 23 B) above for UA's Carry-On Baggage allowances and policies.

c) Where UA is a Participating Carrier or is not the Selected Carrier on an interline itinerary but is an Interlining Carrier that is providing transportation to the passenger based on ticket issued, UA will apply the Selected Carrier's baggage rules throughout the Interline Itinerary.

32

3) Disclosure of Baggage Rules-For baggage rules provisions related to a passenger's first and second checked bag and the passenger's carry-on baggage (i.e., the passenger's "standard" baggage allowance), when UA sells and issues a ticket for an interline itinerary, it will disclose to the passenger on a summary page at the end of an online purchase and/or on the passenger's e-ticket receipt at the time of ticketing, the baggage information relevant to the passenger's itinerary and the applicable baggage rules of the Selected Carrier.

### RULE 24    FLIGHT DELAYS/CANCELLATIONS/AIRCRAFT CHANGES

A)   General

1)   U.S.A. Origin Flights - Where the UA flights originate in the U.S.A., the provisions of this Rule apply to a Passenger who has a Ticket and a confirmed reservation on a flight that incurs a Schedule Change, Force Majeure Event or Irregular Operations.

2)   Non-U.S.A. Origin Flights - Where the UA flight originates outside the U.S.A., the following provisions apply to a Passenger who has a Ticket and a confirmed reservation on a flight:

a)   If local or international laws regulate a Schedule Change, Force Majeure or Irregular Operations, then the procedures in Rule 24 will not be applied.

b)   If no local law otherwise regulates a Schedule Change, Force Majeure or Irregular Operations, then the procedures in Rule 24 will be applied.

3)   Schedules are Subject To Change Without Notice - Times shown on tickets, timetables, published schedules or elsewhere, and aircraft type and similar details reflected on tickets or UA's schedule are not guaranteed and form no part of this contract.  UA may substitute alternate carriers or aircraft, delay or cancel flights, and alter or omit stopping places or connections shown on the ticket at any time. UA will promptly provide Passengers the best available information regarding known delays, cancellations, misconnections and diversions, but UA is not liable for any misstatements or other errors or omissions in connection with providing such information.  No employee, agent or representative of UA can bind UA legally by reason of any statements relating to flight status or other information. Except to the extent provided in this Rule, UA shall not be liable for failing to operate any flight according to schedule, or for any change in flight schedule, with or without notice to the passenger.

B)   Definitions - For the purpose of this Rule, the following terms have the meanings below:

1)   Schedule Change – an advance change in UA's schedule (including a change in operating carrier or itinerary) that is not a unique event such as Irregular Operations or Force Majeure Event as defined below.

2)   Connecting Point – a point to which a Passenger holds or held confirmed space on a flight of one carrier and out of which the Passenger holds or held confirmed space on a flight of the same or another carrier.  All airports through which a city is served by any carrier will be deemed to be a single Connecting Point when the receiving carrier has confirmed reservations to the Delivering Carrier.

3)   Delivering Carrier – a carrier on whose flight a Passenger holds or held confirmed space to a Connecting Point.

4)   Force Majeure Event – any of the following situations:

a)   Any condition beyond UA's control including, but not limited to, meteorological or geological conditions, acts of God, riots, terrorist activities, civil commotions, embargoes, wars, hostilities, disturbances, or unsettled international conditions, either actual, anticipated, threatened or reported, or any delay, demand, circumstances, or requirement due directly or indirectly to such condition;

b)   Any strike, work stoppage, slowdown, lockout, or any other labor-related dispute involving or affecting UA's services;

c)   Any governmental regulation, demand or requirement;

d)   Any shortage of labor, fuel, or facilities of UA or others;

e)   Damage to UA's Aircraft or equipment caused by another party;

f)   Any emergency situation requiring immediate care or protection for a person or property; or

g)   Any event not reasonably foreseen, anticipated or predicted by UA.

5)   Misconnection – occurs at a Connecting Point when a Passenger holding confirmed space on an Original Receiving Carrier is unable to use such confirmed space because the Delivering Carrier was unable to deliver him/her to the Connecting Point in time to connect with the Original Receiving Carrier's flight.
NOTE: The same rules regarding Delivering and Original Receiving Carrier responsibilities apply at the subsequent point(s) of Misconnection as would apply at the point of original Misconnection.

6)   Original Receiving Carrier(s) – a carrier or combination of connecting carriers on whose flight(s) a Passenger originally held or holds confirmed space from a Connecting Point to a destination, next Stopover or Connecting Point.

7)   Irregular Operations – any of the following irregularities:

33

a) Delay in scheduled departure or arrival of a carrier's flight resulting in a Misconnection;

b) Flight or service cancellation, omission of a scheduled stop, or any other delay or interruption in the scheduled operation of a carrier's flight;

c) Substitution of aircraft type that provides different classes of service or different seat configurations;

d) Schedule changes which require Rerouting of Passengers at departure time of the original flight; or

e) Cancellation of a reservation by UA pursuant to Rule 5.

EXCEPTION: UA shall have no obligation to honor another carrier's ticket that does not reflect a confirmed reservation on UA, unless the issuing carrier reissues the ticket for any changes in routing. In the event such carrier is not available to do so, UA reserves the right to reroute passengers only over its own lines between the points named on the original ticket.

C) Schedule Change - When a Passenger's Ticketed flight is affected because of a Schedule Change, UA will, at its election, arrange one of the following:

4) Transport the Passenger on its closest available flight to the Destination, next Stopover point, or transfer point shown on its portion of the Ticket, without Stopover in the same class of service (subject to availability), at no additional cost to the Passenger; provided that if UA determines that such alternate transportation results in a significant change and the Passenger chooses not to accept such alternate transportation, United will provide a refund;

5) When a Schedule Change results in the cancellation of all UA service between two cities, at UA's sole discretion, UA may reroute Passengers over the lines of one or more carriers in an equivalent class of service; provided that if UA determines that such alternate transportation results in a significant change and the Passenger chooses not to accept such alternate transportation, United will provide a refund;

6) Unless the Schedule Change results in a significant change as determined by UA, advise the Passenger that the value of his or her Ticket may be applied toward future travel on United within one year from the date of issue without a change or reissue fee; or

7) Unless the Schedule Change results in a significant change as determined by UA, and if the Passenger is not offered transportation as provided in C) 1) or 2) above and does not choose to apply the value of his or her Ticket toward future travel as provided in C) 3) above, the Passenger will be eligible for a refund upon request. See Rule 27 A).

D) Force Majeure Event - In the event of a Force Majeure Event, UA without notice, may cancel, terminate, divert, postpone, or delay any flight, right of carriage or reservations (whether or not confirmed) and determine if any departure or landing should be made, without any liability on the part of UA. UA may re-accommodate Passengers on another available UA flight or on another carrier or combination of carriers, or via ground transportation, or may refund, in its sole discretion, any unused portions of the Ticket in the form of a travel certificate or travel credit.

E) Irregular Operations

1) Liability - Except to the extent provided in this Rule and the Warsaw and/or Montreal Conventions, UA shall not be liable for any Irregular Operations.

2) Delay, Misconnection or Cancellation

a) When a Passenger's ticket is affected because of Irregular Operations caused by UA, UA will take the following measures:

(i) Transport the Passenger on its own flights, subject to availability, to the Destination, next Stopover point, or transfer point shown on its portion of the Ticket, without Stopover in the same class of service, at no additional cost to the Passenger; or

(ii) At its sole discretion, UA may arrange for the passenger to travel on another carrier. United may also, at its sole discretion, and if acceptable to the passenger, arrange for the passenger to travel via ground transportation.

b) In the event a Passenger misses an onward connecting flight on which space is reserved because the Delivering Carrier did not operate its flight due to Irregular Operations or a Schedule Change, the Delivering Carrier is responsible to arrange for carriage of the Passenger or to make a refund.

3) If a Passenger is not transported as provided in E) 2) above and if the Irregular Operation(s) results in a significant change as determined by UA, the Passenger will be eligible for a refund. Otherwise, a Passenger must make a request for a refund. See Rule 27 A).

4) If space is only available and used on a UA flight(s) of a lower class of service than originally purchased by the passenger, UA will provide a refund of the difference in fare pursuant to Rule 27 C) 5).

F) Amenities for Delayed Passengers

1) Lodging - UA will provide at its option either one night's lodging, or, if no lodging is provided and upon the passenger's request only, reimbursement for one night's lodging in the form of an electronic travel certificate that

34

may be applied to future travel on UA up to a maximum amount determined by UA when a UA flight on which a Passenger is being transported incurs Irregular Operations and the Passenger incurs a delay that is expected to exceed four hours between the hours of 10:00 p.m. to 6:00 a.m. local time.  Where lodging has been offered but not accepted by a Passenger for whatever reason, UA is not liable to reimburse the Passenger for expenses relating to alternative lodging secured independently by the Passenger.

EXCEPTION: Lodging will not be furnished:

a) To a Passenger whose trip is interrupted at a city which is his/her permanent domicile, origin point, or stopover point, or

b) When the destination city airport that is designated on the Passenger's Ticket and the city airport that the Passenger is diverted to are both within the following city groups:

   (i)     Baltimore, MD (BWI)/Washington D.C. Dulles IAD)/Washington D.C. National (DCA)

   (ii)    Brownsville, TX (BRO/Harlingen, TX (HRL)/McAllen, TX (MFE)

   (iii)   Burbank, CA (BUR)/Los Angeles, CA (LAX)/Ontario, CA (ONT)/Orange County, CA (SNA)/Long Beach, CA (LGB)

   (iv)    Chicago, IL O'Hare (ORD)/Chicago, IL Midway (MDW)/Milwaukee, WI (MKE)

   (v)     Colorado Springs, CO (COS)/Denver, CO (DEN)

   (vi)    Dallas, TX Dallas-Ft. Worth International (DFW)/Dallas, TX Love Field (DAL)

   (vii)   Ft. Lauderdale, FL (FLL)/Miami, FL (MIA)/West Palm Beach, FL (PBI)

   (viii)  Houston, TX Bush Intercontinental (IAH)/Houston, TX Ellington AFB (EFD)/Houston, TX Hobby(HOU)

   (ix)    Oakland, CA (OAK)/San Francisco, CA (SFO)/San Jose, CA (SJC)

   (x)     Newark, NJ Newark International (EWR)/New York, NY La Guardia (LGA)/New York, NY Kennedy (JFK)/White Plains, NY (HPN)

   (xi)    London, UK Gatwick (LGW)/London, UK Heathrow (LHR)

c) When such interruption is due to circumstances outside UA's control.

2) Snacks and Meals - UA will provide snacks and/or food and beverage vouchers in the event of an extensive delay caused by UA. Where food and beverage vouchers have been offered but not accepted by a Passenger for whatever reason, UA is not liable to reimburse the Passenger for expenses relating to food and beverage secured independently by the Passenger.

3) Ground Transportation - When lodging is furnished in accordance with 1) above and ground transportation is not furnished by the hotel, UA will provide ground transportation to the place of lodging via public conveyance. Rule 17 also governs any provision of ground transportation to a place of lodging. Where ground transportation has been offered but not accepted by a Passenger for whatever reason, UA is not liable to reimburse the Passenger for expenses relating to alternative ground transportation secured by the Passenger.

4) The sole and exclusive remedy for a passenger who has a claim under this Rule shall be the express amenities provided in this Rule. The passenger shall have no other claims or law or equity for actual, compensatory, or punitive damages. The provision of services in addition to those specifically set forth in this Rule to all or some passengers shall not be construed as a waiver of UA's rights or an expansion of its obligations. Neither shall any delay on the part of UA in exercising or enforcing its rights under this Rule be construed as a waiver of such rights.

G) Carrier in Default - Notwithstanding the provisions of this Rule, UA will not accept for any purposes passenger tickets or related transportation documents issued by any carrier that is in substantial default of its Interline obligations or that voluntarily or involuntarily has become the subject of bankruptcy proceedings (the "Defaulting Carrier").  EXCEPTION: Notwithstanding the provisions of this paragraph, tickets issued by the Defaulting Carrier or its sales agent prior to the default will be accepted solely for transportation over the lines of UA provided such tickets were issued by such Defaulting Carrier in its capacity as agent for UA and specified transportation via UA. When tickets are accepted, no adjustments in fare will be made that would require UA to refund money to the passenger.

H) In the event of a strike or work stoppage which causes any cancellation or suspension of operations of any other carrier, the provisions of this Rule will not apply with respect to passengers holding tickets for transportation on that carrier.

I) "Class of service" in this Contract of Carriage refers to classes of service as determined by UA without regard to the specific level of ancillary services or amenities provided in that class of service (as compared to any originally scheduled flight). Any ancillary service or amenity, including but not limited to live television, wi-fi services, priority boarding, advance seat assignments, and meal service, are not guaranteed. Regardless of whether there is a Schedule Change, Irregular Operations, Force Majeure Event, or other change or circumstance that results in an ancillary service or amenity not being available on any flight, UA shall have no liability for, and shall owe no refund with respect to any failure to provide that amenity or ancillary service. EXCEPTION: If a Passenger has paid for a specific ancillary service or amenity

in advance of the flight as a separate fee specifically designated for such ancillary service or amenity and that ancillary service or amenity is not provided, the Passenger is eligible for a refund of the amount paid if a refund request is made within 90 days of the date the fee was originally paid or the flight date, whichever is later. UA is not liable to refund this fee otherwise eligible for refund if the request is received after that time.

## RULE 25   DENIED BOARDING COMPENSATION

A) Denied Boarding (U.S.A./Canadian Flight Origin) - When there is an Oversold UA flight that originates in the U.S.A. or Canada, the following provisions apply:

1) Request for Volunteers

a) UA will request Passengers who are willing to relinquish their confirmed reserved space in exchange for compensation in an amount determined by UA (including but not limited to check or an electronic travel certificate). The travel certificate will be valid only for travel on UA or designated Codeshare partners for one year from the date of issue and will have no refund value. If a Passenger is asked to volunteer, UA will not later deny boarding to that Passenger involuntarily unless that Passenger was informed at the time he was asked to volunteer that there was a possibility of being denied boarding involuntarily and of the amount of compensation to which he/she would have been entitled in that event.  The request for volunteers and the selection of such person to be denied space will be in a manner determined solely by UA.

2) Boarding Priorities - If a flight is Oversold, no one may be denied boarding against his/her will until UA or other carrier personnel first ask for volunteers who will give up their reservations willingly in exchange for compensation as determined by UA.  If there are not enough volunteers, other Passengers may be denied boarding involuntarily in accordance with UA's boarding priority:

a) Passengers who are Qualified Individuals with Disabilities and their Service Animal or travel assistant, unaccompanied minors under the age of 18 years, or minors between the ages of 5 to 14 years who use the unaccompanied minor service, and for Canada departures only, families traveling together, will be the last to be involuntarily denied boarding if it is determined by UA that such denial would constitute a hardship.

b) The priority of all other confirmed passengers may be determined based on a passenger's fare class, itinerary, status of frequent flyer program membership, whether the passenger purchased the ticket under select UA corporate travel agreements, and the time in which the passenger presents him/herself for check-in without advanced seat assignment.

3) Transportation for Passengers Denied Boarding - When UA is unable to provide previously confirmed space due to an Oversold flight, UA will provide transportation to such Passengers who have been denied boarding whether voluntarily or involuntarily in accordance with the provisions below.

a) UA will transport the Passenger on its own flight to the Destination without Stopover on its next flight on which space is available at no additional cost to the Passenger, regardless of class of service.

b) If space is available on another Carrier's flight regardless of class of service, such flights may be used upon United's sole discretion and the Passenger's request at no additional cost to the Passenger only if such flight provides an earlier arrival than the UA flight offered in 3) a) above.

4) Compensation for Passengers Denied Boarding Involuntarily

a) For passengers traveling in interstate transportation between points within the United States, subject to the exceptions in section d) below, UA shall pay compensation to Passengers denied boarding involuntarily from an Oversold Flight at the rate of 200% of the fare to the Passenger's first Stopover or, if none, Destination, with a maximum of 1,075 USD if UA offers Alternate Transportation that, at the time the arrangement is made, is planned to arrive at the Passenger's Destination or first Stopover more than one hour but less than two hours after the planned arrival time of the Passenger's original flight. If UA offers Alternate Transportation that, at the time the arrangement is made, is planned to arrive at the Passenger's Destination or first Stopover more than two hours after the planned arrival time of the Passenger's original flight, UA shall pay compensation to Passengers denied boarding involuntarily from an Oversold Flight at the rate of 400% of the fare to the Passenger's first Stopover or, if none, Destination with a maximum of 2,150 USD.

b) For passengers traveling from the United States to a foreign point, subject to the exceptions in section d) below, UA shall pay compensation to Passengers denied boarding involuntarily from an Oversold Flight originating at a U.S. airport at the rate of 200% of the fare to the Passenger's first Stopover or, if none, Destination, with a maximum of 1,075 USD if UA offers Alternate Transportation that, at the time the arrangement is made, is planned to arrive at the Passenger's Destination or first Stopover more than one hour but less than four hours after the planned arrival time of the Passenger's original flight. If UA offers Alternate Transportation that, at the time the arrangement is made, is planned to arrive at the Passenger's Destination or first Stopover more than four hours after the planned arrival time of the Passenger's original flight, UA shall pay compensation to Passengers denied boarding involuntarily from an Oversold Flight at the rate of 400% of the fare to the Passenger's first Stopover or, if none, Destination with a maximum of 2,150 USD.

c)   For passengers traveling from Canada to a foreign point, subject to the exceptions in section d) below, UA shall pay compensation to Passengers denied boarding involuntarily from an Oversold Flight originating at a Canadian airport as follows: 900 CAD if the passenger reaches his final destination within six hours of the time stated on the original ticket; 1800 CAD if the passenger reaches his final destination between six and nine hours of the time stated on the original ticket; and 2400 CAD if the passenger reaches his final destination more than nine hours after the time stated on the original ticket.

d)   EXCEPTIONS:  A Passenger denied boarding involuntarily from an Oversold Flight shall not be eligible for denied boarding compensation if:

    (i)   The flight is cancelled;

    (ii)   The Passenger holding a Ticket for confirmed reserved space does not comply fully with the requirements in this Contract of Carriage Requirements regarding ticketing, check-in, reconfirmation procedures, and acceptance for transportation;

    (iii)   The flight for which the Passenger holds confirmed reserved space is unable to accommodate the Passenger because of substitution of equipment of lesser capacity when required by operational or safety reasons or, on an aircraft with a designed passenger capacity of 60 or fewer seats, the flight for which the passenger holds confirmed reserved space is unable to accommodate that passenger due to weight/balance restrictions when required by operational or safety reasons;

    (iv)   The Passenger is offered accommodations or is seated in a section of the aircraft other than that specified on his/her ticket at no extra charge.  Provided, if a Passenger is seated in a section for which a lower fare applies, the Passenger will be entitled to a refund applicable to the difference in fares;

    (v)   The Passenger is accommodated on Alternate Transportation at no extra cost, which at the time such arrangements are made, is planned to arrive at the airport of the Passenger's next Stopover, (if any), or at the Destination, not later than 60 minutes after the planned arrival time of the flight on which the Passenger held confirmed reserved space;

    (vi)   The Passenger is an employee of UA or of another Carrier or other person traveling without a confirmed reserved space; or

    (vii)   The Passenger does not present him/herself at the loading gate for boarding at least 15 minutes prior to scheduled domestic departures, and 30 minutes prior to scheduled international departures. See Rule 5 D) for additional information regarding boarding cut-off times.

5)   Payment Time and Form for Passengers Traveling Between Points within the United States or from the United States to a Foreign Point

    a)   Compensation in the form of check will be made by UA on the day and at the place where the failure to provide confirmed reserved space occurs, and if accepted by the Passenger, the Passenger will provide a signed receipt to UA.  However, when UA has arranged, for the Passenger's convenience, Alternate Transportation that departs before the compensation to the Passenger under this provision can be prepared and given to the Passenger, the compensation shall be sent by mail or other means to the Passenger within 24 hours thereafter.

    b)   UA may offer free or reduced rate air transportation in lieu of a check payment due under this Rule,  if the value of the transportation credit offered is equal to or greater than the monetary compensation otherwise due and UA informs the Passenger of the amount and that the Passenger may decline the transportation benefit and receive the monetary compensation.

6)   Payment Time and Form for Passengers departing Canada

    a)   Compensation will be issued no later than either before the next scheduled departure time for the Passenger or within 48 hours after the Passenger has been denied boarding.

    b)   Compensation may be paid in form of cash, prepaid card, EFT, bank check or, with the Passenger's written agreement, a travel voucher.

7)   Limitation of Liability - If UA's offer of compensation pursuant to the above provisions is accepted by the Passenger, such payment will constitute full compensation for all actual or anticipatory damages incurred or to be incurred by the Passenger as a result of UA's failure to provide the Passenger with confirmed reserved space.  If UA's offer of compensation pursuant to the above provisions is not accepted, UA's liability is limited to actual damages proved not to exceed 1350 USD per Ticketed Passenger as a result of UA's failure to provide the Passenger with confirmed reserved space.  Passenger will be responsible for providing documentation of all actual damages claimed.  UA shall not be liable for any punitive, consequential or special damages arising out of or in connection with UA's failure to provide the Passenger with confirmed reserved space.

B)   Denied Boarding Non-U.S.A./Canada Flight Origin - Where there is an Oversold UA flight that originates outside the U.S.A. or Canada, no compensation will be provided except where required by local or international laws regulating Oversold flights.

**RULE 26   REROUTING**

A)   Rerouting Eligibility - Unless the fare purchased otherwise indicates, UA will reroute a Passenger at the Passenger's request and upon presentation of the Ticket or portion thereof then held by the Passenger plus payment of any applicable fees, charges, and fare differentials.

B)   Fare Applicable to Rerouting or Change in Destination

   1)   Passengers may change the routing and/or the ultimate destination designated on his/her Ticket in accordance with paragraph 2 below provided that, after transportation has commenced, a one-way Ticket will not be converted into a Round-Trip, Circle-Trip, or Open-Jaw Trip Ticket.

   2)   Except as otherwise provided in Rule 25, the fare and charges applicable to any changes in itinerary, class of service, or change in ultimate destination made at the Passenger's request at an office of UA prior to arrival at the ultimate destination named on the original Ticket, shall be the fare and charges in effect on the date when the revised routing and/or ultimate destination is entered on the Passenger's new Ticket.  Any difference between the fare and charges so applicable to the original Ticket issued to the Passenger will be either collected from or refunded to the Passenger, as the case may be.  Basic Economy tickets, even if unused, have no residual value and cannot be applied towards the purchase of future travel.

C)   Fare Applicable to Upgrading Class of Service While in Flight

   1)   When a Passenger moves from one compartment to another compartment of a combination compartment aircraft while in flight, an additional collection will be made in an amount equal to the difference between:

      a)   The one-way fare from Passenger's point of origin on such flight to the last scheduled stop prior to the Passenger's change in compartment, applicable to the class of service used, plus the one-way fare from such stop to the Passenger's destination on such flight, applicable to transportation in the compartment to which the Passenger is moving, and

      b)   The fare paid for transportation from the Passenger's origin to destination on such flight.  When the amount described in a) above is less than the amount in b) above, no additional payment will be required.
         EXCEPTION:  Passengers traveling at a Round-Trip fare or any fare not having a one-way value, may upgrade all or any portion of their itinerary only upon payment of the full normal fare for the total itinerary.

      c)   The passenger expressly authorizes UA to collect any additional applicable charges from the passenger arising out of a passenger occupying a class of service which is different than the class reflected on the passenger's boarding pass.

   2)   The acceptance of such Passenger in the compartment to which he/she is moving for travel beyond the next scheduled stopping point in the flight will be subject to the availability of space.  Discounts, other than for children, will not apply.

**RULE 27   REFUNDS**

A)   Ticket Refunds - Involuntary

   1)   The amount UA will refund upon surrender of the unused portion of the Passenger's Ticket for reasons pursuant to Rule 21 or Rule 24 will be as follows:

      a)   If no portion of the Ticket has been used:  An amount equal to the fare and charges paid.

         EXCEPTION: UA shall not be obligated to refund any portion(s) of a fully unused Ticket which does not reflect a confirmed reservation on a UA flight involved in Irregular Operations, unless such Ticket was issued by UA.

      b)   If a portion of the Ticket has been used:

         (i)   One-way fares – An amount equal to the prorated value of the unused segment based on the fare component. UA will make no refund when alternate transportation is provided by UA and accepted by the passenger.

         (ii)   Round-Trip, Circle-Trip, or Open-Jaw fare – An amount equal to the fare paid for the unused transportation from the point of termination to the destination or next Stopover point named on the ticket, or to a point at which transportation is to be resumed.  If both outbound and inbound fares on a domestic roundtrip ticket are the same, then 50% of the round-trip fare for the class of service paid, and for the unflown segment only.

         (iii)   Area fare/flat rate fare – the refund amount will be computed by applying the same rate of discount, if any, applied in computing the original fare from the point of termination to the destination named on the Ticket, next Stopover, or the point where air transportation will be resumed via:
            a.   The Routing specified on the Ticket, if the point of termination was on the Routing of the Ticket, or
            b.   If the point of termination was not on the Routing specified on the Ticket, the direct Routing of any carrier operating service between such points.

38

(iv)    If no fare of the type (fare basis) paid by the Passenger is published between the point of termination and the Passenger's destination or next Stopover point, the amount of the refund will be the same proportion of the normal coach (Y) fare published between the point of termination and the Passenger's destination or next Stopover point, as the fare paid is of the normal coach (Y) fare between the Passenger's point of origin or previous Stopover point and destination or next Stopover point.
Exception:  UA shall not be obligated to refund any portion(s) of a Ticket which does not reflect a confirmed reservation on a UA flight involved in Irregular Operations, unless such ticket was issued by UA.

(v)    The amount of refund will not exceed the fare component for the portion of the ticket from the last point of stopover to the next point of stopover or final destination.

c)    Refund will be made in accordance with this Rule, provided request for such refund has been made prior to the expiration of Ticket, where required.

2)    UA will make no refund but may, at its discretion, provide ground transportation to the destination airport without charge when the destination city airport designated on the Passenger's Ticket and the city airport where the flight terminates are both within any of the following city groups:

a)    Baltimore, MD (BWI)/Washington D.C. Dulles (IAD)/Washington D.C. National (DCA)

b)    Brownsville, TX (BRO/Harlingen, TX (HRL)/McAllen, TX (MFE)

c)    Burbank, CA (BUR)/Los Angeles, CA (LAX)/Ontario, CA (ONT)/Orange County, CA (SNA)/Long Beach, CA (LGB)

d)    Chicago, IL O'Hare (ORD)/Chicago, IL Midway (MDW)/Milwaukee, WI (MKE)

e)    Colorado Springs, CO (COS)/Denver, CO (DEN)

f)    Dallas, TX Dallas-Ft. Worth International (DFW)/Dallas, TX Love Field (DAL)

g)    Ft. Lauderdale, FL (FLL)/Miami, FL (MIA)/West Palm Beach, FL (PBI)

h)    Houston, TX Bush Intercontinental (IAH)/Houston, TX Ellington AFB (EFD)/Houston, TX Hobby (HOU)

i)    Oakland, CA (OAK)/San Francisco, CA (SFO)/San Jose, CA (SJC)

j)    Newark, NJ Newark International (EWR)/New York, NY La Guardia (LGA)/New York, NY/Kennedy (JFK)/White Plains, NY (HPN)

k)    London, UK Gatwick (LGW)/London, UK Heathrow (LHR)

3)    When a Passenger holding a Ticket for a higher class of service between a point of Origin and a Destination is required by the carrier to use a lower class of service for any portion of such carriage the amount of refund will be as follows:

a)    FOR UNRESTRICTED PREMIUM FARES: 50% of the prorated fare for that segment plus applicable variable taxes and fees.

b)    FOR SPECIAL AND RESTRICTED FARES: the lowest applicable fare at the time the ticket was purchased or the difference between the upgradeable and non-upgradeable fare type.

c)    This section does not apply to Passengers who purchase upgrades through miles and/or cash. If a Passenger pays for an upgrade that he does not receive, any recovery is limited to the amount paid for the upgrade in miles and/or cash.

B)    Ticket Refunds - Voluntary
For Tickets eligible for refunds, unless it is a refund as stated in Paragraph (A) above, UA will, upon the Passenger's surrender of the unused portion of a UA issued ticket or voided Ticket, refund to the Passenger as follows:

1)    If no portion of the Ticket has been used, in accordance with these rules, the refund will be an amount equal to the total fare and charges paid.

2)    If a portion of the Ticket has been used, in accordance with these rules, the refund will be an amount equal to the positive difference if any, between the fare and charges applicable to the Ticket issued to the Passenger, and the fare and charges applicable to the transportation of the Passenger covered by the used portion of the Ticket.

3)    Refund will be made, provided request for such refund has been made not later than the expiration date of the Ticket.

4)    UA assumes no obligation to issue a voluntary refund unless such Ticket was issued by UA on UA Ticket Stock.

5)    Any applicable administrative service charge or cancellation fee included as part of the published fare rule for the Ticket in question will be deducted from the amount to be refunded under 1) and 2) above.

6)    UA will issue refunds for eligible tickets within seven (7) business days of determining that a refund is due for credit card purchases and twenty (20) business days after receiving a complete refund request for purchases made with cash, check, or other forms of payment.

39

C)   Other Refunds

1)   Baggage service charges are non-refundable, but a Passenger who does not travel as a result of a flight cancellation, Schedule Change, or Irregular Operations will be eligible for a refund. United will also reimburse Passengers for any fee charged to transport bag(s) that are lost.

3)   Booking service charges are non-refundable, but Passengers may be eligible for a full refund upon request if the entire reservation is canceled within 24 hours of purchase and if the reservation is made one week or more prior to scheduled flight departure and purchased directly through UA.

4)   Day-of-departure upgrade fees are non-refundable, but if a flight for which an upgrade fee has been paid is affected by a flight cancellation, Schedule Change, or Irregular Operations, and the Passenger cannot be accommodated in First Class on a later flight, Passenger will be eligible for a refund upon request.

5)   Passengers who are eligible for a refund of service or other fee(s), must request a refund within 90 days of the date the fee(s) was originally paid or flight date, whichever is later.  UA is not liable to refund the service or other fees otherwise eligible for refund if the request is received after that time.

6)   If a Passenger is removed from a United® Premium Plus seat, Economy Plus seat, or from Preferred Seating for which a fee has been paid, and the Passenger is not re-accommodated in a seat of equal or greater value, or if a Passenger is downgraded from a class of service and is not re-accommodated in a seat in an equal or greater class of service for which a fee has been paid, the Passenger is eligible for a refund of this fee upon request.

D)   Persons to Whom Refund is Made - Except as provided below, UA will refund in accordance with this Rule only to the person named as the Passenger on the Ticket.
EXCEPTION 1:

1)   Tickets issued under a Universal Air Travel Plan (UATP) will be refundable only to the subscriber against whose account the Ticket was charged.

2)   Tickets issued against a Transportation Request issued by a government agency, other than the U.S.A Government, will be refunded only to the government agency that issued the Transportation Request.

3)   Tickets issued against a U.S.A Government Transportation Request (GTR) will be refunded only to the U.S.A. Government agency which issued the GTR by check made payable to the "Treasurer of the United States".

4)   Tickets issued against a credit card honored by UA will be refunded only to the account of the person to whom such credit card was issued.

5)   Tickets issued in the name of a minor will be refunded to the parent, guardian, or a third party as designated in accordance with Exception 2 below.
EXCEPTION 2:  If at the time of purchase, the purchaser designates on the Ticket another person or entity to whom refund shall be made, the refund will be made to the person so designated.  A refund made in accordance with this procedure to a person representing his/herself as the person so designated on the Ticket exchange order shall be deemed a valid refund, and UA will not be liable to the purchaser, or any other person for another refund.
EXCEPTION 3:  If at the time of application for refund, evidence is submitted that a company purchased the Ticket on behalf of its employees, or the travel agent has made a refund to its client, such refund will be made directly to the employee's company or the travel agent.

E)   Non-refundable Tickets:

1)   General Rule – Except as provided in Rules 4 and 27 C), UA will not refund any portion of a Ticket that is purchased with a non-refundable fare, including the fare and any taxes, fees, or other charges included within the total price paid for the Ticket.

2)   Application of Unused Ticket toward Future Ticket Purchase - UA may allow a portion of the non-refundable fare paid for an unused and unexpired non-refundable UA Ticket to be applied towards the purchase of future travel on UA, provided it is done in accordance with the applicable fare rule in place at the time of such request.  Change fees and other administrative charges may apply.  Basic Economy tickets, even if unused, have no residual value after date of departure and cannot be applied towards the purchase of future travel.  Any portion not so applied will not be refunded in any form.

F)   Lost Tickets

1)   Amount of Refund - When a Passenger loses a UA issued Ticket eligible for a refund, or the unused portion thereof, UA will, subject to the conditions set forth below, make a refund to the Passenger in the following amounts, as applicable.

a)   If no portion of the Ticket has been used, the refund will be an amount equal to the fare and charges paid, less service charges as indicated below.

b)   If a portion of the Ticket has been used, and

(i)    The Passenger has purchased a new Ticket covering the same transportation as that covered by the unused portion of the lost Ticket, the refund will be an amount equal to the fare and charges paid for such new Ticket, or

(ii)    The Passenger has not purchased a new Ticket covering the same transportation as that covered by the unused portion of the lost Ticket, and free transportation is not provided by UA, the refund will be an amount equal to the positive difference, if any, between the fare and charges paid, and the full normal fare and charges applicable to the transportation of the Passenger covered by the used portion of the Ticket, or

(iii)    Where, in UA's judgment, a hardship exists and UA provides a free Ticket covering the lost portion(s) upon payment of service charges shown below, no further refund shall be due.

2)    Application for Refund of Lost Tickets

    a)    A refund will be made for eligible tickets in accordance with 1) above, provided application has been made no later than one month after the expiration date of the lost Ticket.

    b)    The application must be made on forms provided by UA for such refunds.

    c)    A refund will be made by UA upon application for such refund, provided that the lost Ticket or lost portion thereof has not previously been honored for transportation or refunded to any person during a period of three months from the date the loss is reported, and provided that the person to whom the refund is made agrees, in such form as may be provided by UA, to indemnify UA, including agreeing to return to UA such refund, for any loss or damage which it may sustain by reason of the use of the lost Ticket or portion thereof.

3)    Service Charge - UA will impose a service charge of 150.00 USD/150.00 CAD per ticket for handling request for refund of a lost Ticket or portion thereof.
EXCEPTION: No service charge will be imposed for Military Passengers when transportation is paid for with a U.S. Government Transportation Request (Form No. 1169).

4)    Non-refundable Tickets - UA will not refund any portion of a lost non-refundable Ticket, including the fare and any taxes, fees, or other charges. For applicable service charge, the Ticket will be reissued, if application is submitted prior to scheduled travel. Non-refundable Tickets will not be reissued after the date of travel reflected on each Flight Coupon.

G)    Foreign Currency Refunds

1)    All refunds will be subject to government laws, rules, regulations, or orders of the country in which the Ticket was originally purchased and of the country in which the refund is being made.

2)    Refunds will be made in the currency in which the fare was paid, or, at UA's election, in lawful currency of the country of the carrier making the refund in the amount equivalent to the amount due in the currency in which the fare or fares for the flight covered by the Ticket as originally issued was collected.

H)    Overcharge Refunds - Refund claims for overcharges must be submitted to UA in writing within 45 days after the operation of the flight Segment to which such overcharge claim relates, after which time no claim or legal action based on such overcharge can be maintained.

I)    Optional Services – Ticket refund will include fees charged to a Passenger for optional services that the Passenger was unable to use due to an oversale situation or flight cancellation.

## RULE 28  ADDITIONAL LIABILITY LIMITATIONS

For the purposes of international carriage governed by the Montreal Convention, the liability rules set out in the Montreal Convention are fully incorporated by reference herein and shall supersede and prevail over any provisions of this tariff which may be inconsistent with those rules.

A)    The Carrier shall be liable under Article 17 of the Warsaw Convention or Montreal Convention, whichever may apply, for recoverable compensatory damages sustained in the case of death or bodily injury of a passenger, as provided in the following paragraphs:

1)    The Carrier shall not be able to exclude or limit its liability for damages not exceeding 151,880 SDR for each passenger.

2)    The Carrier shall not be liable for damages to the extent that they exceed 151,880 SDR for each passenger if the Carrier proves that:

    (a)    such damage was not due to the negligence or other wrongful act or omission of the Carrier or its servants or agents; or

    (b)    such damage was solely due to the negligence or other wrongful act or omission of a third party.

3)    The Carrier reserves all other defenses and limitations available under the Warsaw Convention or the Montreal Convention, whichever may apply, to such claims including, but not limited to, the exoneration defense of Article

41

21 of the Warsaw Convention and Article 20 of the Montreal Convention, except that the Carrier shall not invoke Articles 20 and 22(1) of the Warsaw Convention in a manner inconsistent with paragraphs (1) and (2) hereof.

4) With respect to third parties, the Carrier reserves all rights of recourse against any other person, including, without limitation, rights of contribution and indemnity.

5) The Carrier agrees that, subject to applicable law, recoverable compensatory damages for such claims may be determined by reference to the laws of the country of the domicile or country of permanent residence of the passenger.

B) In cases of bodily injury or death, the Carrier shall make an advance payment where the Carrier determines it is necessary to meet the immediate economic needs of, and hardship suffered by, a passenger as provided in the following paragraphs:

1) Unless a dispute arises over the identity of the person to whom an advance payment shall be made, the Carrier shall, without delay, make the advance payment to the passenger in an amount or amounts determined by the Carrier in its sole discretion. In the event of death of a passenger, the amount of the advance payment shall not be less than 16,000 Special Drawing Rights, which shall be paid to a representative of the passenger's next of kin eligible to receive such advance payment as determined by the Carrier in its sole discretion.

2) The Carrier shall make the advance payment as an advance against the Carrier's liability under the Warsaw Convention, or the Montreal Convention, whichever may apply. An advance payment shall not constitute recognition of liability. An advance payment shall be offset against, or deducted from the payment of, any settlement or judgment with respect to any claim for compensation on behalf of the passenger.

3) The Carrier, in making an advance payment, does not waive any rights, defenses, or limitations available under the Warsaw Convention, or the Montreal Convention, whichever may apply, to any claim, nor shall acceptance of an advance payment constitute a release of any claim, whatsoever, by any person.

4) The Carrier, in making an advance payment, preserves its right to seek contribution or indemnity from any other person for such payment, which shall not be deemed to be a voluntary contribution or contractual payment on the part of the Carrier.

5) The Carrier may recover an advance payment from any person where it is proven that the Carrier is not liable for any damage sustained by the passenger, or where it is proven that the person was not entitled to receive the payment, or where and to the extent that it is proven that the person who received the advance payment caused, or contributed to, the damage.

C) The Carrier shall be liable for damage occasioned by delay in the carriage of passengers by air, as provided in the following paragraphs:

1) The Carrier shall not be liable if it proves that it and its servants and agents took all measures that could reasonably be required to avoid the damage, or that it was impossible for it or them to take such measures.

2) Damages occasioned by delay are subject to the terms, limitations and defenses set forth in the Warsaw Convention and the Montreal Convention, whichever may apply, in addition to any limitation or defense recognized by a Court with proper jurisdiction over a claim.

3) The Carrier reserves all defenses and limitations available under the Warsaw Convention or the Montreal Convention, whichever may apply to claims for damage occasioned by delay, including, but not limited to, the exoneration defense of Article 21 of the Warsaw Convention and Article 20 of the Montreal Convention. Under the Montreal Convention, the liability of the Carrier for damage caused by delay is limited to 6,303 SDR per passenger. The limits of liability shall not apply in cases described in Article 25 of the Warsaw Convention or Article 22 (5) of the Montreal Convention, whichever may apply.

D) The Carrier is liable for damages sustained in the case of destruction or loss of, damage to, or delay of checked and unchecked baggage, as provided in the following paragraphs:

1) Except as provided below, the liability of the Carrier is limited to 1,519 SDR for each passenger in the case of destruction, loss, damage, or delay of baggage, whether checked or unchecked, under the Warsaw Convention or the Montreal Convention, whichever may apply. Unless the passenger proves otherwise:

   a. any baggage checked by a passenger shall be considered to be the property of that passenger;

   b. a particular piece of baggage, checked or unchecked, shall not be considered to be the property of more than one passenger; and

   c. unchecked baggage, including personal items, shall be considered to be the property of the passenger in possession of the baggage at the time of embarkation.

2) For purposes of determining liability with respect to lost, damaged or destroyed baggage under the Warsaw Convention, the weight of each piece of such baggage shall be deemed to be the maximum allowable weight for each piece of such baggage under the applicable restrictions, unless the actual weight is stated on the Baggage Check.

42

3) In the event of delivery to the Passenger of part but not all of the Passenger's Checked Baggage, or in the event of damage to part but not all of such Baggage, the liability of UA with respect to the undelivered or damaged portion under the Warsaw Convention shall be reduced proportionately on the basis of weight, regardless of the value of any part of the Baggage or contents thereof.

4) In the case of unchecked baggage, the Carrier is liable only to the extent the damage resulted from its fault, or that of its servants or agents. The Carrier is not liable for baggage carried in the passenger compartment of the aircraft and remaining in the personal possession of the passenger.
NOTE: Assistance provided by crewmembers to properly store such items does not transfer liability to the Carrier.

5) The Carrier is liable for damage sustained in case of destruction or loss of checked baggage upon condition only that the event which caused the destruction or loss took place on board the aircraft or during any period within which the checked baggage was in the charge of the Carrier. However, the Carrier is not liable if and to the extent that the damage resulted from the inherent defect, quality or vice of the baggage. Further, the Carrier's liability for the destruction, loss, damage or delay of baggage is subject to the terms, limitations and defenses set forth in the Warsaw Convention and the Montreal Convention, whichever may apply, in addition to any limitation or defense recognized by a Court with proper jurisdiction over a claim.

6) The Carrier reserves all defenses and limitations available under the Warsaw Convention and the Montreal Convention, whichever may apply to such claims including, but not limited to, the defense of Article 20 of the Warsaw Convention and Article 19 of the Montreal Convention, and the exoneration defense of Article 21 of the Warsaw Convention and Article 20 of the Montreal Convention, except that the Carrier shall not invoke Article 22(2) and (3) of the Warsaw Convention in a manner inconsistent with paragraph (1) hereof. The limits of liability shall not apply in cases described in Article 25 of the Warsaw Convention or Article 22 (5) of the Montreal Convention, whichever may apply.

E) Under the Warsaw Convention and the Montreal Convention, whichever may apply, an action for damages must be brought within two years, and a complaint must be made to the carrier within seven calendar days in the case of damage to baggage, and 21 calendar days in the case of delay thereof. For baggage claims, reimbursement for any expenses will be based upon proof of claim acceptable to UA.

For purposes of all other carriage (including Domestic Carriage) not governed by the Montreal Convention or other applicable international law (unless specifically noted below), the following liability limitations and other exclusions apply:

F) UA shall not be liable for any death, injury, delay, loss or other damage of whatsoever nature (hereafter referred to collectively as "damage") arising out of or in connection with carriage or other services performed by UA, unless such damage is proven to have been caused by the sole negligence or willful misconduct of UA and there has been no contributory negligence on the part of the Passenger.

G) UA shall not be liable for any damage arising out of UA's compliance with any laws, government regulations, orders, rules, requirements or security directives or as a result of a Passenger's failure to comply with such laws, government regulations, orders, rules, requirements or security directives or as a result of Passenger's reliance on advice provided by UA regarding such laws, regulations, orders, rules, requirements or security directives. See also Rule 19.

H) UA shall not be liable for any punitive, consequential or special damages arising out of or in connection with carriage or other services performed by UA, whether or not UA had knowledge that such damage might be incurred.

I) Any limitations or exclusions of liability of UA shall apply to and be for the benefit of UA's agents, employees, vendors and representatives acting within the scope of their employment and also to any person whose aircraft is used by UA and its agents, employees or representatives acting within the scope of their employment.

J) Nothing herein shall be deemed to affect the rights and liability of UA with regard to any claims brought by, on behalf of, or in respect to any person who has willfully caused damage which resulted in death, wounding, or other bodily injury of a Passenger.

K) Additional Baggage Liability Limitations and Exclusions:

1) If all of the Passenger's Ticketed segments are for carriage within the U.S.A., the following apply:

a) Liability for the loss of, damage to or delay in delivery of a Passenger's personal property, including Baggage, when such personal property or Baggage has been checked (unless a higher value is declared in advance and additional charges are paid and personal property is not otherwise excludable), is limited to USD 4,700 per Ticketed Passenger. Passenger will be responsible for documenting and proving the actual value of the loss. For baggage claims, reimbursement for any expenses will be based upon proof of claim acceptable to UA.

b) When transportation is over the lines of UA and one or more carriers with a liability limitation exceeding USD 4,700 for each fare-paying Passenger and responsibility for loss, damage, or delay in the delivery of baggage cannot be determined, the liability limitation of USD 4,700 for each fare-paying Passenger will be

43

applied to all carriers. When transportation is via UA and one or more carriers, which exclude certain items in checked baggage from liability, UA will not be liable for the excluded items.

c)      UA assumes no responsibility or liability for Baggage or other items carried in the Passenger compartment of the aircraft or that a Passenger may leave at airports.

d)      In the case of loss of, damage to or delay in delivery of a Passenger's personal property, including Baggage, a preliminary notice of claim must be submitted to UA by the Passenger within twenty-four hours after arrival of the flight on which the Baggage was or was to be transported.  In the event of failure to give such preliminary notice of claim (absent extraordinary circumstances to be determined at UA's discretion), no action shall lie against UA.

e)      After preliminary notice of claim to UA by the Passenger, the Passenger must obtain a written claim form from UA.

f)      The completed written claim form pertaining to the claimed loss of, damage to or delay in delivery of a Passenger's personal property, including Baggage must be received by UA's System Tracing Center from the Passenger within 45 days after the flight date.  If the Passenger fails to return the completed written claim form within the specified time period (absent extraordinary circumstances to be determined at UA's discretion), no action shall lie against UA. No employee, agent or representative of UA can bind UA legally by reason of any statements relating to the baggage claims process or any other information, it is the Passenger's responsibility to follow the claims process in this Rule.

g)      Any baggage checked by a passenger shall be considered to be the property of that passenger.

2)  Wheelchairs and Other Assistive Devices

a)      With respect to Domestic Carriage and carriage to/from Canada only, carrier baggage liability limits do not apply to claims for loss, damage or delay concerning wheelchairs or other assistive devices.  The notice and claim requirements, however, do apply.

b)      In the case of a lost, damaged, or destroyed wheelchair or other assistive device, the Passenger must file a preliminary notice of claim with the Carrier at the airport immediately upon arrival. If the Passenger is unable to file a report upon arrival, they must contact the United Airlines Assistive Device Desk at 1-866-261-2395 (toll free within the U.S. and Canada) or 281-553-2395 (worldwide) or email AssistedDevice@united.com within 24 hours of arrival for Domestic Carriage and within seven calendar days of arrival for carriage to/from Canada.

c)      The Passenger must then complete a written claim form from UA within the time limitations defined in Rule 28 K) 2) b) above or under Rule 28 E), if applicable, and provide documentary proof of loss or damage such as the baggage incident report number, the passenger's itinerary, baggage tag, evidence of purchase, model, serial number and type of the wheelchair or other assistive device, and any other information that may be requested by the Carrier to verify the facts alleged and to assess the credibility of the claim. If a wheelchair or other assistive device can be returned to the Passenger in the condition in which it was received by making reasonable repairs, UA may, at the Passenger's request, make the repairs.

d)      UA has the right to inspect and document any pre-existing damage prior to acceptance of wheelchairs or other assistive devices as Checked Baggage.  UA reserves the right to refuse to transport large wheelchairs or other assistive devices that, due to the physical size of an aircraft compartment, cannot be carried upright safely without risk of serious damage to the wheelchair, or that would cause a load imbalance in a small baggage compartment and violate weight and balance safety requirements.  In such case, UA will use reasonable efforts to assist the Passenger in identifying a flight using an aircraft that can accommodate the wheelchair.

3)  EXCLUSIONS:  UA shall not be liable for the loss of, damage to or delay in delivery of any of the following:

a.      Antiques, artifacts, collectibles, religious items;

b.      Antlers;

c.      Backpacks not designed for travel, sleeping bags and knapsacks made of plastic, vinyl or other easily torn material with aluminum frames, outside pockets or with protruding straps and buckles;

d.      Business equipment and business samples;

e.      Portable multimedia players including, but not limited to, CD, DVD or MP3 players;

f.      Chinaware, glass, ceramics, pottery;

g.      Computer hardware/software and electronic components/equipment;

h.      Items checked in sacks or paper/plastic bags that do not have sufficient durability, do not have secure closures or do not provide sufficient protection to the contents;

i.      Items checked in corrugated/cardboard boxes, including cardboard boxes provided by UA, except for items that otherwise would be suitable for transportation without the cardboard box (e.g., bicycle, garment bag);

44

j. Electronic and mechanical items, including cell phones, electronic games, and other related items;

k. Eyeglasses, Binoculars, Prescription Sunglasses and Non-Prescription Sunglasses and all other eyewear and eye/vision devices;

l. Flowers and plants;

m. Garment bags not designed for travel;

n. Irreplaceable items;

o. Items made of paper (e.g., advertising displays, blueprints, maps, manuscripts, business/personal documents, historical documents, photos, books, negotiable papers, securities, etc.);

p. Jewelry;

q. Keys;

r. Liquids, perfumes, alcohol/liquor, jerkins, ZAM ZAM water;

s. Medicines and medical equipment (not used as assistive devices pursuant to 14 CFR 382.3);

t. Money, gift cards and gift certificates;

u. Musical instruments-Guitars, violins, violas, cellos, organs, harps, drums;

v. Natural fur products;

w. Perishable items such as medicine, flowers, and food (e.g., fruits and vegetables, cheese, fresh or frozen meat or poultry, seafood, baked goods, dry ice, and tobacco);

x. Photographic/cinematographic/audio/video equipment, cameras and related items;

y. Precious metals/stones;

z. Tools, battery powered hand tools, tool boxes/containers, automotive towbars;

aa. Totally unprotected items such as tennis racquets and umbrellas, either individually checked or tied/strapped to the outside of luggage;

bb. Recreational and sporting goods, including but not limited to, archery equipment, baseball equipment, boogie/kite/skim/speed/skate boards, bicycles, bowling equipment, camping equipment, fencing equipment, golfing equipment, gymnastic equipment, hockey/lacrosse sticks, javelins, oars, paintball equipment, parachutes and parasails, pool cues, skating equipment, tennis equipment, water skiing/snow skiing/snowboards/wakeboards, hang gliding equipment, kayaks/canoes, personal human transporters, fishing rods, sculls, surfboards, windsurfing sailboards, scuba diving masks and pressure gauges, copes, and sporting trophies.

cc. Silverware, knives, swords;

dd. Strollers, folding wagons, bassinets, and infant carrying seats;

ee. Watches (Timepieces);

ff. Works of art such as paintings or sculptures; or

gg. Any other similar valuable property or irreplaceable property included in the Passenger's Checked or Carry-on Baggage with or without the knowledge of UA.

4) Assistance rendered to the Passenger by UA's employees and/or agents in loading, unloading, or storing unchecked, Carry-On Baggage or Cabin Baggage shall be considered as gratuitous service to the Passenger for which UA shall not be liable.

5) UA's liability for Baggage is also limited in all of the following respects:

a) UA shall not be liable for Baggage not claimed by Passenger immediately upon arrival.

b) UA shall not be liable for damage caused by a Passenger's property, whether such damage is to the Passenger's own property or to other's property.

c) UA shall not be liable for the loss of, damage to or delay in delivery of any Baggage accepted by another carrier for Interline Transfer to UA, if the Baggage is not acceptable for transportation as Checked Baggage by UA.

d) A Passenger traveling with an animal shall be responsible for compliance with all governmental regulations and restrictions, including furnishing valid health and rabies vaccination certificates when required. UA will not be liable for loss or expense due to the Passenger's failure to comply with this provision, and UA will not be responsible if any animal is refused passage into or through any country, state or territory. (See Rule 23.)

e) UA shall not be liable for any Baggage that has pre-existing damage, or for which UA has received a signed release form from the Passenger.

f) UA shall not be liable for damage to Checked Baggage which does not impair the ability of such Baggage to function and specifically shall not be liable for damage arising from the normal wear and tear of handling, including minor cuts, scratches, scuffs, dents, punctures, marks or soil.

45

g) UA shall not be liable for loss of or damage to protruding parts such as wheels, feet, external pockets, pull and extending handles, hanger hooks, external locks, pull straps and security straps if this loss or damage occurred as a result of normal wear and tear.

h) UA shall not be liable for loss of or damage to articles due to a manufacturer's defect or due to overpacked Baggage, or for the destruction, loss or damage that results from an inherent defect, quality or vice of the Baggage.

i) UA shall not be liable for loss of or damage to articles which are strapped, fastened or otherwise secured to other Checked Baggage and which are not independently tagged and/or packaged.  Such items include, but are not limited to, sleeping bags, luggage racks, luggage carriers and umbrellas.

j) UA shall not be liable for damage caused by improperly packed Checked Baggage or Carry-on Baggage.

k) UA shall not be liable for the loss of, damage to or delay in delivery of any Checked Baggage of a person traveling on a Ticket who is other than the Passenger to whom the Ticket was issued.

l) UA shall not be liable for the loss of, damage to or delay in delivery of any Checked Baggage of an employee of an airline other than UA or such employee's family or friends traveling on a non-revenue Ticket. EXCEPTION: If the other airline has a ZED agreement with UA, UA will comply with its terms regarding loss of, damage to or delay in delivery of any Checked Baggage of an employee of another airline or such employee's family or friends traveling on a non-revenue Ticket.

m) UA will not be liable for delivery or interim expenses incurred by the Passenger with delayed baggage if Passenger fails to meet the check-in time requirements set out in Rule 5 D.

n) UA is not liable for loss, damage, or delay of a Passenger's Checked Baggage, Carry-on Baggage, wheelchair or other assistive device, or any personal item that may result from a security search of such items conducted by an agent of any local, state, or federal agency, or from confiscation by an agent of any local, state, or federal agency.

6) Services of Other Carriers

a) UA's liability for damage, if any, shall be limited to occurrences on its own flights.

b) A carrier issuing a ticket or checking baggage for carriage over the lines of others (e.g., a carrier providing Interline Transportation) does so only as agent and is not liable for actions on the part of the operating carrier.

c) UA shall not be liable for the death or injury of a Passenger not occurring on its own operated flights.

## RULE 29   CUSTOMER SERVICE COMPLAINTS

Customer compliments and complaints may be made by email or mail to the following:

- Website address:
https://www.united.com/en/us/customercare

- Mailing address:
Customer Care – NHCCR
United Airlines, Inc.
900 Grand Plaza Dr.
Houston, TX  77067-4323

If a third-party submits a complaint on behalf of a customer, the third party must provide evidence along with the complaint that it has the authority to act on the customer's behalf.  Evidence of authorization shall include a signed letter from the customer or an executed power of attorney authorizing the third party to act on behalf of the customer.  Third-parties must submit this evidence of authorization along with the complaint.  United will not reply if evidence of third-party authorization is not provided or if United determines in its sole discretion that the evidence is incomplete or insufficient.

## RULE 30   CONSENT TO USE OF PERSONAL DATA

Upon booking a ticket for transportation, purchasing other services, or participating in any UA program or service such as MileagePlus or the United Club, you hereby authorize UA and its affiliates and authorized agents to (i) collect, process, retain and use, and (ii) transfer to third parties, including, but not limited to, subcontractors, agents, affiliates, marketing partners, other carriers, and government agencies, for their use, processing and retention, any and all personal data you provide when UA believes in good faith that it is in the interests of aviation security or that disclosure is otherwise necessary or advisable or as UA deems necessary to carry out any and all business purposes related to the program or services being requested and/or in the promotion of other information, goods, and services that may be of interest to you, including, but not limited to, the following purposes: making a reservation; purchasing a ticket; purchasing cargo services; participating in MileagePlus services; obtaining ancillary services, including accommodating special service requests; accounting, billing and auditing; checking credit or other payment mechanisms; operating frequent flyer programs; systems testing, maintenance and

development; customer relations; sales and marketing; promotions for UA and/ or its affiliates goods and services and third party goods and services; statistical analysis; developing and tailoring current and future services; facilitating travel, including obtaining immigration, security, and customs clearance; complying with applicable laws, regulations, government requests, law enforcement requests, and/or valid court orders; providing data to third parties or governmental or law enforcement agencies to comply with, or assist in the development of, security, safety, or health measures for passengers, baggage or cargo, or to provide for the prevention or detection of imminent criminal acts or the apprehension or prosecution of offenders; protecting the legal rights of UA and/or its affiliates.

If a passenger wants to learn more about UA's Privacy Policy, it may be viewed at www.united.com. This policy is merely a statement of administrative protocol; it is not a contract, nor is it made, or intended to be made, a part of this Contract of Carriage, nor does it create any contractual or legal rights.